# CITY OF EDMONDS *v.* OXFORD HOUSE, INC., ET AL.

No. 94–23.   Argued March 1, 1995—Decided May 15, 1995

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA and KENNEDY, JJ., joined, *post*, p. 738.

*W. Scott Snyder* argued the cause and filed briefs for petitioner.

*William F. Sheehan* argued the cause for private respondents. With him on the brief were *Elizabeth M. Brown, David E. Jones, John P. Relman, Robert I. Heller,* and *Steven R. Shapiro.*

*Deputy Solicitor General Bender* argued the cause for respondent United States. With him on the brief were *Solicitor General Days, Assistant Attorney General Patrick, Cornelia T. L. Pillard, Jessica Dunsay Silver,* and *Gregory B. Friel.**

---

*Briefs of *amici curiae* urging reversal were filed for the City of Lubbock by *Jean E. Shotts, Jr.;* for the City of Mountlake Terrace by *Gregory G. Schrag;* for the Township of Upper St. Clair by *Robert N. Hackett;* and for the International City/County Management Association et al. by *Richard Ruda, Lee Fennell,* and *Michael J. Wahoske.*

Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Massachusetts et al. by *Scott Harshbarger,* Attorney General of Massachusetts, and *Stanley J. Eichner, Donna L. Palermino,* and *Leo T. Sorokin,* Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Alan G. Lance* of Idaho, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *Frankie Sue Del Papa* of Nevada; *Tom Udall* of New Mexico, *Charles W. Burson* of Tennessee, *Dan Morales* of Texas, *Jan Graham* of Utah, *Rosalie Simmonds Ballantine* of the Virgin Islands, and *Darrell V. McGraw, Jr.,* of West Virginia; for the American Association on Mental Retardation et al. by *Lois G. Williams, Jerrold J. Ganzfried, Gregg A. Hand, Leonard S. Rubenstein,* and *Ira A. Burnim;* for the American Association of Retired Persons by *Steven S. Zaleznick, Michael Schuster, Bruce B. Vignery,* and *Deborah M. Zuckerman;* for the American Planning Association by *Brian W. Blaesser* and *Daniel M. Lauber;* for the American Society of Addiction Medicine et al. by *Paul M. Smith, Seth P. Stein, Robert L. Schonfeld, Richard Taranto,* and *Carolyn I. Polowy;* for the American Train Dispatchers Division of Brotherhood of Locomotive Engineers et al. by *Lawrence M. Mann;* and for the National Fair Housing Alliance by *Timothy C. Hester, Robert A. Long, Jr.,* and *Christina T. Uhlrich.*

Briefs of *amici curiae* were filed for the City of Fultondale by *Palmer W. Norris* and *Fred Blanton, Jr.;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Anthony T. Caso.*

JUSTICE GINSBURG delivered the opinion of the Court.

The Fair Housing Act (FHA or Act) prohibits discrimination in housing against, *inter alios*, persons with handicaps.[1] Section 807(b)(1) of the Act entirely exempts from the FHA's compass "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U. S. C. § 3607(b)(1). This case presents the question whether a provision in petitioner City of Edmonds' zoning code qualifies for § 3607(b)(1)'s complete exemption from FHA scrutiny. The provision, governing areas zoned for single-family dwelling units, defines "family" as "persons [without regard to number] related by genetics, adoption, or marriage, or a group of five or fewer [unrelated] persons." Edmonds Community Development Code (ECDC) § 21.30.010 (1991).

The defining provision at issue describes who may compose a family unit; it does not prescribe "*the* maximum number of occupants" a dwelling unit may house. We hold that § 3607(b)(1) does not exempt prescriptions of the family-defining kind, *i. e.*, provisions designed to foster the family character of a neighborhood. Instead, § 3607(b)(1)'s absolute exemption removes from the FHA's scope only total occupancy limits, *i. e.*, numerical ceilings that serve to prevent overcrowding in living quarters.

I

In the summer of 1990, respondent Oxford House opened a group home in the City of Edmonds, Washington (City), for

---

[1] The FHA, as originally enacted in 1968, prohibited discrimination based on race, color, religion, or national origin. See 82 Stat. 83. Proscription of discrimination based on sex was added in 1974. See Housing and Community Development Act of 1974, § 808(b), 88 Stat. 729. In 1988, Congress extended coverage to persons with handicaps and also prohibited "familial status" discrimination, *i. e.*, discrimination against parents or other custodial persons domiciled with children under the age of 18. 42 U. S. C. § 3602(k).

10 to 12 adults recovering from alcoholism and drug addiction. The group home, called Oxford House-Edmonds, is located in a neighborhood zoned for single-family residences. Upon learning that Oxford House had leased and was operating a home in Edmonds, the City issued criminal citations to the owner and a resident of the house. The citations charged violation of the zoning code rule that defines who may live in single-family dwelling units. The occupants of such units must compose a "family," and family, under the City's defining rule, "means an individual or two or more persons related by genetics, adoption, or marriage, or a group of five or fewer persons who are not related by genetics, adoption, or marriage." ECDC § 21.30.010. Oxford House-Edmonds houses more than five unrelated persons, and therefore does not conform to the code.

Oxford House asserted reliance on the Fair Housing Act, 102 Stat. 1619, 42 U. S. C. § 3601 *et seq.*, which declares it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter." § 3604(f)(1)(A). The parties have stipulated, for purposes of this litigation, that the residents of Oxford House-Edmonds "are recovering alcoholics and drug addicts and are handicapped persons within the meaning" of the Act. App. 106.

Discrimination covered by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped] person[s] equal opportunity to use and enjoy a dwelling." § 3604(f)(3)(B). Oxford House asked Edmonds to make a "reasonable accommodation" by allowing it to remain in the single-family dwelling it had leased. Group homes for recovering substance abusers, Oxford urged, need 8 to 12 residents to be financially and therapeutically viable. Edmonds declined to permit Oxford House to stay in a single-family residential zone, but passed an ordi-

nance listing group homes as permitted uses in multifamily and general commercial zones.

Edmonds sued Oxford House in the United States District Court for the Western District of Washington, seeking a declaration that the FHA does not constrain the City's zoning code family definition rule. Oxford House counterclaimed under the FHA, charging the City with failure to make a "reasonable accommodation" permitting maintenance of the group home in a single-family zone. The United States filed a separate action on the same FHA "reasonable accommodation" ground, and the two cases were consolidated. Edmonds suspended its criminal enforcement actions pending resolution of the federal litigation.

On cross-motions for summary judgment, the District Court held that ECDC § 21.30.010, defining "family," is exempt from the FHA under § 3607(b)(1) as a "reasonable . . . restrictio[n] regarding the maximum number of occupants permitted to occupy a dwelling." App. to Pet. for Cert. B–7. The United States Court of Appeals for the Ninth Circuit reversed; holding § 3607(b)(1)'s absolute exemption inapplicable, the Court of Appeals remanded the cases for further consideration of the claims asserted by Oxford House and the United States. *Edmonds* v. *Washington State Building Code Council*, 18 F. 3d 802 (1994).

The Ninth Circuit's decision conflicts with an Eleventh Circuit decision declaring exempt under § 3607(b)(1) a family definition provision similar to the Edmonds prescription. See *Elliott* v. *Athens*, 960 F. 2d 975 (1992).[2] We granted

---

[2] The single-family residential zoning provision at issue in *Elliott* defines "family," in relevant part, as "[o]ne (1) or more persons occupying a single dwelling unit, provided that unless all members are related by blood, marriage or adoption, no such family shall contain over four (4) persons." 960 F. 2d, at 976.

certiorari to resolve the conflict, 513 U. S. 959 (1994), and we now affirm the Ninth Circuit's judgment.[3]

## II

The sole question before the Court is whether Edmonds' family composition rule qualifies as a "restrictio[n] regarding the maximum number of occupants permitted to occupy a dwelling" within the meaning of the FHA's absolute exemption. 42 U. S. C. § 3607(b)(1).[4] In answering this question, we are mindful of the Act's stated policy "to provide, within constitutional limitations, for fair housing throughout the United States." § 3601. We also note precedent recognizing the FHA's "broad and inclusive" compass, and therefore according a "generous construction" to the Act's complaint-filing provision. *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 209, 212 (1972). Accordingly, we regard this case as an instance in which an exception to "a general state-

---

[3] On May 17, 1993, the State of Washington enacted a law providing:

"No city may enact or maintain an ordinance, development regulation, zoning regulation or official control, policy, or administrative practice which treats a residential structure occupied by persons with handicaps differently than a similar residential structure occupied by a family or other unrelated individuals. As used in this section, 'handicaps' are as defined in the federal fair housing amendments act of 1988 (42 U. S. C. Sec. 3602)." Wash. Rev. Code § 35.63.220 (1994).

The United States asserts that Washington's new law invalidates ECDC § 21.30.010, Edmonds' family composition rule, as applied to Oxford House-Edmonds. Edmonds responds that the effect of the new law is "far from clear." Reply to Brief in Opposition 4. Even if the new law prevents Edmonds from enforcing its rule against Oxford House, a live controversy remains because the United States seeks damages and civil penalties from Edmonds, under 42 U. S. C. §§ 3614(d)(1)(B) and (C), for conduct occurring prior to enactment of the state law. App. 85.

[4] Like the District Court and the Ninth Circuit, we do not decide whether Edmonds' zoning code provision defining "family," as the City would apply it against Oxford House, violates the FHA's prohibitions against discrimination set out in 42 U. S. C. §§ 3604(f)(1)(A) and (f)(3)(B).

ment of policy" is sensibly read "narrowly in order to preserve the primary operation of the [policy]." *Commissioner* v. *Clark*, 489 U. S. 726, 739 (1989).[5]

## A

Congress enacted § 3607(b)(1) against the backdrop of an evident distinction between municipal land-use restrictions and maximum occupancy restrictions.

Land-use restrictions designate "districts in which only compatible uses are allowed and incompatible uses are excluded." D. Mandelker, Land Use Law § 4.16, pp. 113–114 (3d ed. 1993) (hereinafter Mandelker). These restrictions typically categorize uses as single-family residential, multiple-family residential, commercial, or industrial. See, *e. g.*, 1 E. Ziegler, Jr., Rathkopf's The Law of Zoning and Planning § 8.01, pp. 8–2 to 8–3 (4th ed. 1995); Mandelker § 1.03, p. 4; 1 E. Yokley, Zoning Law and Practice § 7–2, p. 252 (4th ed. 1978).

Land-use restrictions aim to prevent problems caused by the "pig in the parlor instead of the barnyard." *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 388 (1926). In particular, reserving land for single-family residences preserves the character of neighborhoods, securing "zones where family values, youth values, and the blessings of quiet

---

[5] The dissent notes *Gregory* v. *Ashcroft*, 501 U. S. 452 (1991), as an instance in which the Court did not tightly cabin an exemption contained in a statute proscribing discrimination. See *post*, at 743–744. *Gregory* involved an exemption in the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. §§ 621–634, covering state and local elective officials and "appointee[s] on the policymaking level." § 630(f). The question there was whether state judges fit within the exemption. We held that they did. A state constitutional provision, not a local ordinance, was at stake in *Gregory*—a provision going "beyond an area traditionally regulated by the States" to implicate "a decision of the most fundamental sort for a sovereign entity." 501 U. S., at 460. In that light, the Court refused to attribute to Congress, absent plain statement, any intent to govern the tenure of state judges. Nothing in today's opinion casts a cloud on the soundness of that decision.

seclusion and clean air make the area a sanctuary for people."
*Village of Belle Terre* v. *Boraas,* 416 U. S. 1, 9 (1974); see
also *Moore* v. *East Cleveland,* 431 U. S. 494, 521 (1977)
(Burger, C. J., dissenting) (purpose of East Cleveland's
single-family zoning ordinance "is the traditional one of pre-
serving certain areas as family residential communities").
To limit land use to single-family residences, a municipality
must define the term "family"; thus family composition rules
are an essential component of single-family residential use
restrictions.

Maximum occupancy restrictions, in contradistinction, cap
the number of occupants per dwelling, typically in relation
to available floor space or the number and type of rooms.
See, *e. g.,* International Conference of Building Officials, Uni-
form Housing Code § 503(b) (1988); Building Officials and
Code Administrators International, Inc., BOCA National
Property Maintenance Code §§ PM–405.3, PM–405.5 (1993)
(hereinafter BOCA Code); Southern Building Code Con-
gress, International, Inc., Standard Housing Code §§ 306.1,
306.2 (1991); E. Mood, APHA–CDC Recommended Minimum
Housing Standards § 9.02, p. 37 (1986) (hereinafter APHA–
CDC Standards).[6]  These restrictions ordinarily apply uni-
formly to *all* residents of *all* dwelling units.  Their purpose
is to protect health and safety by preventing dwelling over-
crowding.  See, *e. g.,* BOCA Code §§ PM–101.3, PM–405.3,
PM–405.5 and commentary; Abbott, Housing Policy, Housing
Codes and Tenant Remedies: An Integration, 56 B. U. L. Rev.
1, 41–45 (1976).

We recognized this distinction between maximum occu-
pancy restrictions and land-use restrictions in *Moore* v. *East
Cleveland,* 431 U. S. 494 (1977).  In *Moore,* the Court held
unconstitutional the constricted definition of "family" con-

---

[6] Contrary to the dissent's suggestion, see *post,* at 745, n. 5, terminology
in the APHA–CDC Standards bears a marked resemblance to the formula-
tion Congress used in § 3607(b)(1).  See APHA–CDC Standards § 2.51,
p. 12 (defining "Permissible Occupancy" as "the maximum number of indi-
viduals permitted to reside in a dwelling unit, or rooming unit").

tained in East Cleveland's housing ordinance. East Cleveland's ordinance "select[ed] certain categories of relatives who may live together and declare[d] that others may not"; in particular, East Cleveland's definition of "family" made "a crime of a grandmother's choice to live with her grandson." *Id.*, at 498–499 (plurality opinion). In response to East Cleveland's argument that its aim was to prevent overcrowded dwellings, streets, and schools, we observed that the municipality's restrictive definition of family served the asserted, and undeniably legitimate, goals "marginally, at best." *Id.*, at 500 (footnote omitted). Another East Cleveland ordinance, we noted, "specifically addressed . . . the problem of overcrowding"; that ordinance tied "the maximum permissible occupancy of a dwelling to the habitable floor area." *Id.*, at 500, n. 7; accord, *id.*, at 520, n. 16 (STEVENS, J., concurring in judgment). Justice Stewart, in dissent, also distinguished restrictions designed to "preserv[e] the character of a residential area," from prescription of "a minimum habitable floor area per person," *id.*, at 539, n. 9, in the interest of community health and safety.[7]

Section 3607(b)(1)'s language—"restrictions regarding the maximum number of occupants permitted to occupy a dwelling"—surely encompasses maximum occupancy restrictions.[8]

---

[7] Other courts and commentators have similarly differentiated between land-use restrictions and maximum occupancy restrictions. See, *e. g.*, *State* v. *Baker*, 81 N. J. 99, 110, 405 A. 2d 368, 373 (1979); 7A E. McQuillin, The Law of Municipal Corporations § 24.504 (3d ed. 1989); Abbott, Housing Policy, Housing Codes and Tenant Remedies: An Integration, 56 B. U. L. Rev. 1, 41 (1976).

[8] The plain import of the statutory language is reinforced by the House Committee Report, which observes:

"A number of jurisdictions limit the number of occupants per unit based on a minimum number of square feet in the unit or the sleeping areas of the unit. Reasonable limitations by governments would be allowed to continue, as long as they were applied to all occupants, and did not operate to discriminate on the basis of race, color, religion, sex, national origin, handicap or familial status." H. R. Rep. No. 100–711, p. 31 (1988).

But the formulation does not fit family composition rules typically tied to land-use restrictions.  In sum, rules that cap the total number of occupants in order to prevent overcrowding of a dwelling "plainly and unmistakably," see *A. H. Phillips, Inc.* v. *Walling*, 324 U. S. 490, 493 (1945), fall within § 3607(b)(1)'s absolute exemption from the FHA's governance; rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters can contain, do not.[9]

## B

Turning specifically to the City's Community Development Code, we note that the provisions Edmonds invoked against Oxford House, ECDC §§ 16.20.010 and 21.30.010, are classic examples of a use restriction and complementing family composition rule.  These provisions do not cap the number of people who may live in a dwelling.  In plain terms, they di-

---

[9] Tellingly, Congress added the § 3607(b)(1) exemption for maximum occupancy restrictions at the same time it enlarged the FHA to include a ban on discrimination based on "familial status."  See *supra*, at 728, n. 1. The provision making it illegal to discriminate in housing against families with children under the age of 18 prompted fears that landlords would be forced to allow large families to crowd into small housing units.  See, *e. g.*, Fair Housing Amendments Act of 1987: Hearings on H. R. 1158 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 100th Cong., 1st Sess., 656 (1987) (remarks of Rep. Edwards) (questioning whether a landlord must allow a family with 10 children to live in a two-bedroom apartment).  Section 3607(b)(1) makes it plain that, pursuant to local prescriptions on maximum occupancy, landlords legitimately may refuse to stuff large families into small quarters. Congress further assured in § 3607(b)(1) that retirement communities would be exempt from the proscription of discrimination against families with minor children.  In the sentence immediately following the maximum occupancy provision, § 3607(b)(1) states: "Nor does any provision in this subchapter regarding familial status apply with respect to housing for older persons."

rect that dwellings be used only to house families. Captioned "USES," ECDC § 16.20.010 provides that the sole "Permitted Primary Us[e]" in a single-family residential zone is "[s]ingle-family dwelling units." Edmonds itself recognizes that this provision simply "defines those uses permitted in a single family residential zone." Pet. for Cert. 3.

A separate provision caps the number of occupants a dwelling may house, based on floor area:

> "Floor Area. Every dwelling unit shall have at least one room which shall have not less than 120 square feet of floor area. Other habitable rooms, except kitchens, shall have an area of not less than 70 square feet. Where more than two persons occupy a room used for sleeping purposes, the required floor area shall be increased at the rate of 50 square feet for each occupant in excess of two." ECDC § 19.10.000 (adopting Uniform Housing Code § 503(b) (1988)).[10]

This space and occupancy standard is a prototypical maximum occupancy restriction.

Edmonds nevertheless argues that its family composition rule, ECDC § 21.30.010, falls within § 3607(b)(1), the FHA exemption for maximum occupancy restrictions, because the rule caps at five the number of unrelated persons allowed to occupy a single-family dwelling. But Edmonds' family composition rule surely does not answer the question: "What is the maximum number of occupants permitted to occupy a house?" So long as they are related "by genetics, adoption, or marriage," any number of people can live in a house. Ten siblings, their parents and grandparents, for example, could dwell in a house in Edmonds' single-family residential zone without offending Edmonds' family composition rule.

---

[10] An exception to this provision sets out requirements for efficiency units in apartment buildings. See ECDC § 19.10.000 (1991) (adopting Uniform Housing Code § 503(b) (1988)).

Family living, not living space per occupant, is what ECDC § 21.30.010 describes. Defining family primarily by biological and legal relationships, the provision also accommodates another group association: Five or fewer unrelated people are allowed to live together as though they were family. This accommodation is the peg on which Edmonds rests its plea for § 3607(b)(1) exemption. Had the City defined a family solely by biological and legal links, § 3607(b)(1) would not have been the ground on which Edmonds staked its case. See Tr. of Oral Arg. 11–12, 16. It is curious reasoning indeed that converts a family values preserver into a maximum occupancy restriction once a town adds to a related persons prescription "and also two unrelated persons." [11]

Edmonds additionally contends that subjecting single-family zoning to FHA scrutiny will "overturn Euclidian zoning" and "destroy the effectiveness and purpose of single-family zoning." Brief for Petitioner 11, 25. This contention both ignores the limited scope of the issue before us and exaggerates the force of the FHA's antidiscrimination provisions. We address only whether Edmonds' family composition rule qualifies for § 3607(b)(1) exemption. Moreover, the FHA antidiscrimination provisions, when applicable, require only "reasonable" accommodations to afford persons with handicaps "equal opportunity to use and enjoy" housing. §§ 3604(f)(1)(A) and (f)(3)(B).

---

[11] This curious reasoning drives the dissent. If Edmonds allowed only related persons (whatever their number) to dwell in a house in a single-family zone, then the dissent, it appears, would agree that the § 3607(b)(1) exemption is unavailable. But so long as the City introduces a specific number—*any* number (two will do)—the City can insulate its single-family zone *entirely* from FHA coverage. The exception-takes-the-rule reading the dissent advances is hardly the "generous construction" warranted for antidiscrimination prescriptions. See *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 212 (1972).

* * *

The parties have presented, and we have decided, only a threshold question: Edmonds' zoning code provision describing who may compose a "family" is not a maximum occupancy restriction exempt from the FHA under § 3607(b)(1). It remains for the lower courts to decide whether Edmonds' actions against Oxford House violate the FHA's prohibitions against discrimination set out in §§ 3604(f)(1)(A) and (f)(3)(B). For the reasons stated, the judgment of the United States Court of Appeals for the Ninth Circuit is

*Affirmed.*

JUSTICE THOMAS, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, dissenting.

Congress has exempted from the requirements of the Fair Housing Act (FHA) "*any* reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U. S. C. § 3607(b)(1) (emphasis added). In today's decision, the Court concludes that the challenged provisions of petitioner's zoning code do not qualify for this exemption, even though they establish a specific number—five—as the maximum number of unrelated persons permitted to occupy a dwelling in the single-family neighborhoods of Edmonds, Washington. Because the Court's conclusion fails to give effect to the plain language of the statute, I respectfully dissent.

I

Petitioner's zoning code reserves certain neighborhoods primarily for "[s]ingle-family dwelling units." Edmonds Community Development Code (ECDC) § 16.20.010(A)(1) (1991), App. 225. To live together in such a dwelling, a group must constitute a "family," which may be either a traditional kind of family, comprising "two or more persons re-

lated by genetics, adoption, or marriage," or a nontraditional one, comprising "a group of five or fewer persons who are not [so] related." § 21.30.010, App. 250. As respondent United States conceded at oral argument, the effect of these provisions is to establish a rule that "no house in [a single-family] area of the city shall have more than five occupants unless it is a [traditional kind of] family." Tr. of Oral Arg. 46. In other words, petitioner's zoning code establishes for certain dwellings "a five-occupant limit, [with] an exception for [traditional] families." *Ibid.*

To my mind, the rule that "no house . . . shall have more than five occupants" (a "five-occupant limit") readily qualifies as a "restrictio[n] regarding the maximum number of occupants permitted to occupy a dwelling." In plain fashion, it "restrict[s]"—to five—"the maximum number of occupants permitted to occupy a dwelling." To be sure, as the majority observes, the restriction imposed by petitioner's zoning code is not an absolute one, because it does not apply to related persons. See *ante,* at 736. But § 3607(b)(1) does not set forth a narrow exemption only for "absolute" or "unqualified" restrictions regarding the maximum number of occupants. Instead, it sweeps broadly to exempt *any* restrictions *regarding* such maximum number. It is difficult to imagine what broader terms Congress could have used to signify the categories or kinds of relevant governmental restrictions that are exempt from the FHA.[1]

---

[1] A broad construction of the word "any" is hardly novel. See, *e. g., John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav. Bank,* 510 U. S. 86, 96 (1993) (citing, as examples where "Congress spoke without qualification" in ERISA, an exemption for " '*any security*' issued to a plan by a registered investment company" and an exemption for " '*any assets* of . . . an insurance company or *any assets* of a plan which are held by . . . an insurance company' " (quoting 29 U. S. C. §§ 1101(b)(1), 1103(b)(2)) (emphasis in *John Hancock*)); *Citizens' Bank* v. *Parker,* 192 U. S. 73, 81 (1904) ("The word *any* excludes selection or distinction. It declares the exemption without limitation").

Consider a real estate agent who is assigned responsibility for the city of Edmonds. Desiring to learn all he can about his new territory, the agent inquires: "Does the city have *any* restrictions regarding the maximum number of occupants permitted to occupy a dwelling?" The accurate answer must surely be in the affirmative—yes, the maximum number of unrelated persons permitted to occupy a dwelling in a single-family neighborhood is five. Or consider a different example. Assume that the Federal Republic of Germany imposes no restrictions on the speed of "cars" that drive on the Autobahn but does cap the speed of "trucks" (which are defined as all other vehicles). If a conscientious visitor to Germany asks whether there are *"any* restrictions regarding the maximum speed of motor vehicles permitted to drive on the Autobahn," the accurate answer again is surely the affirmative one—yes, there is a restriction regarding the maximum speed of trucks on the Autobahn.

The majority does not ask whether petitioner's zoning code imposes any restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Instead, observing that pursuant to ECDC § 21.30.010, "any number of people can live in a house," so long as they are "related 'by genetics, adoption, or marriage,'" the majority concludes that § 21.30.010 does not qualify for § 3607(b)(1)'s exemption because it "surely does not answer the question: 'What is the maximum number of occupants permitted to occupy a house?'" *Ante,* at 736. The majority's question, however, does not accord with the text of the statute. To take advantage of the exemption, a local, state, or federal law need not impose a restriction *establishing* an *absolute* maximum number of occupants; under § 3607(b)(1), it is necessary only that such law impose a restriction "regarding" the maximum number of occupants. Surely, a restriction can "regar[d]"— or "concern," "relate to," or "bear on"—the maximum num-

ber of occupants without establishing an absolute maximum number in all cases.[2]

I would apply §3607(b)(1) as it is written. Because petitioner's zoning code imposes a qualified "restrictio[n] regarding the maximum number of occupants permitted to occupy a dwelling," and because the statute exempts from the FHA "any" such restrictions, I would reverse the Ninth Circuit's holding that the exemption does not apply in this case.[3]

## II

The majority's failure to ask the right question about petitioner's zoning code results from a more fundamental error in focusing on "maximum occupancy restrictions" and "family composition rules." See generally *ante*, at 731–734. These two terms—and the two categories of zoning rules they describe—are simply irrelevant to this case.

---

[2] It is ironic that the majority cites Uniform Housing Code §503(b) (1988), which has been incorporated into petitioner's zoning code, see ECDC §19.10.000, App. 248, as a "prototypical maximum occupancy restriction" that would qualify for §3607(b)(1)'s exemption. *Ante*, at 736. Because §503(b), as the majority describes it, "caps the number of occupants a dwelling may house, *based on floor area*," *ibid.* (emphasis added), it actually caps the *density* of occupants, not their *number*. By itself, therefore, §503(b) "surely does not answer the question: 'What is the maximum number of occupants permitted to occupy a house?'" *Ibid.* That is, even under §503(b), there is no single absolute maximum number of occupants that applies to every house in Edmonds. Thus, the answer to the majority's question is the same with respect to both §503(b) and ECDC §21.30.010: "It depends." With respect to the former, it depends on the size of the house's bedrooms, see *ante*, at 736 (quoting §503(b)); with respect to the latter, it depends on whether the house's occupants are related.

[3] I would also remand the case to the Court of Appeals to allow it to pass on respondents' argument that petitioner's zoning code does not satisfy §3607(b)(1)'s requirement that qualifying restrictions be "reasonable." The District Court rejected this argument, concluding that petitioner's "five-unrelated-person limit is reasonable as a matter of law," App. to Pet. for Cert. B–10, but the Court of Appeals did not address the issue.

## A

As an initial matter, I do not agree with the majority's interpretive premise that "this case [is] an instance in which an exception to 'a general statement of policy' is sensibly read 'narrowly in order to preserve the primary operation of the [policy].'" *Ante,* at 731–732 (quoting *Commissioner* v. *Clark,* 489 U. S. 726, 739 (1989)). Why *this* case? Surely, it is not because the FHA has a "policy"; every statute has that. Nor could the reason be that a narrow reading of 42 U. S. C. §3607(b)(1) is necessary to preserve the primary operation of the FHA's stated policy "to provide . . . for fair housing throughout the United States." §3601. Congress, the body responsible for deciding how specifically to achieve the objective of fair housing, obviously believed that §3607(b)(1)'s exemption for "any . . . restrictions regarding the maximum number of occupants permitted to occupy a dwelling" is consistent with the FHA's general statement of policy. We do Congress no service—indeed, we *negate* the "primary operation" of §3607(b)(1)—by giving that congressional enactment an artificially narrow reading. See *Rodriguez* v. *United States,* 480 U. S. 522, 526 (1987) *(per curiam)* ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be law"); *Board of Governors, FRS* v. *Dimension Financial Corp.,* 474 U. S. 361, 374 (1986) ("Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself . . . , in the end, prevents the effectuation of congressional intent").[4]

---

[4] The majority notes "precedent recognizing the FHA's 'broad and inclusive' compass, and therefore according a 'generous construction' to the Act's complaint-filing provision." *Ante,* at 731 (quoting *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205, 209, 212 (1972)). What we actually said in *Trafficante* was that "[t]he language of the Act is broad and inclusive." *Id.,* at 209. This is true enough, but we did not "therefore" accord a generous construction either to the FHA's "antidiscrimination

In any event, as applied to the present case, the majority's interpretive premise clashes with our decision in *Gregory* v. *Ashcroft*, 501 U. S. 452, 456–470 (1991), in which we held that state judges are not protected by the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. §§ 621–634 (1988 ed. and Supp. V). Though the ADEA generally protects the employees of States and their political subdivisions, see § 630(b)(2), it exempts from protection state and local elected officials and "appointee[s] on the policymaking level," § 630(f). In concluding that state judges fell within this exemption, we did not construe it "narrowly" in order to preserve the "primary operation" of the ADEA. Instead, we specifically said that we were "not looking for a plain statement that judges are excluded" from the Act's coverage. *Gregory, supra,* at 467. Moreover, we said this *despite* precedent recognizing that the ADEA "'broadly prohibits'" age discrimination in the workplace. *Trans World Airlines, Inc.* v. *Thurston,* 469 U. S. 111, 120 (1985) (quoting *Lorillard* v. *Pons,* 434 U. S. 575, 577 (1978)). Cf. *ante,* at 731 (noting "precedent recognizing the FHA's 'broad and inclusive' compass" (quoting *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205, 209 (1972))).

Behind our refusal in *Gregory* to give a narrow construction to the ADEA's exemption for "appointee[s] on the policymaking level" was our holding that the power of Congress to "legislate in areas traditionally regulated by the States" is

---

prescriptions," see *ante,* at 737, n. 11, or to its complaint-filing provision, § 810(a), 42 U. S. C. § 3610(a) (1970 ed.) (repealed 1988). Instead, without any reference to the language of the Act, we stated that we could "give vitality to § 810(a) only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute." 409 U. S., at 212. If we were to apply such logic to this case, we would presumably "give vitality" to § 3607(b)(1) by giving it a generous rather than a narrow construction.

"an extraordinary power in a federalist system," and "a power that we must assume Congress does not exercise lightly." 501 U. S., at 460. Thus, we require that " 'Congress should make its intention "clear and manifest" if it intends to pre-empt the historic powers of the States.' " *Id.*, at 461 (quoting *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 65 (1989)). It is obvious that land use—the subject of petitioner's zoning code—is an area traditionally regulated by the States rather than by Congress, and that land-use regulation is one of the historic powers of the States. As we have stated, "zoning laws and their provisions . . . are peculiarly within the province of state and local legislative authorities." *Warth* v. *Seldin*, 422 U. S. 490, 508, n. 18 (1975). See also *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments"); *FERC* v. *Mississippi*, 456 U. S. 742, 768, n. 30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity"); *Village of Belle Terre* v. *Boraas*, 416 U. S. 1, 13 (1974) (Marshall, J., dissenting) ("I am in full agreement with the majority that zoning . . . may indeed be the most essential function performed by local government"). Accordingly, even if it might be sensible in other contexts to construe exemptions narrowly, that principle has no application in this case.

## B

I turn now to the substance of the majority's analysis, the focus of which is "maximum occupancy restrictions" and "family composition rules." The first of these two terms has the sole function of serving as a label for a category of zoning rules simply invented by the majority: rules that "cap the number of occupants per dwelling, typically in relation to available floor space or the number and type of rooms," that "ordinarily apply uniformly to *all* residents of *all* dwelling units," and that have the "purpose . . . to protect health and safety by preventing dwelling overcrowding." *Ante*, at

733.[5] The majority's term does bear a familial resemblance to the statutory term "restrictions regarding the maximum number of occupants permitted to occupy a dwelling," but it should be readily apparent that the category of zoning rules the majority labels "maximum occupancy restrictions" does not exhaust the category of restrictions exempted from the FHA by § 3607(b)(1). The plain words of the statute do not refer to "available floor space or the number and type of rooms"; they embrace no requirement that the exempted restrictions "apply uniformly to *all* residents of *all* dwelling units"; and they give no indication that such restrictions

---

[5] To my knowledge, no federal or state judicial opinion—other than three § 3607(b)(1) decisions dating from 1992 and 1993—employs the term "maximum occupancy restrictions." Likewise, not one of the model codes from which the majority constructs its category of zoning rules uses that term either. See *ante*, at 733 (citing authorities). Accordingly, it is difficult to conceive how Congress, in 1988, could have "enacted § 3607(b)(1) against the backdrop of an evident distinction between municipal land-use restrictions and maximum occupancy restrictions." *Ante*, at 732.

In this context, the majority seizes on a phrase that appears in a booklet published jointly by the American Public Health Association and the Centers for Disease Control—"'the maximum number of individuals permitted to reside in a dwelling unit, or rooming unit.'" *Ante*, at 733, n. 6 (quoting APHA–CDC Recommended Minimum Housing Standards § 2.51, p. 12 (1986)). Even if, as the majority boldly asserts, this phrase "bears a marked resemblance to the formulation Congress used in § 3607(b)(1)," *ante*, at 733, n. 6, I fail to comprehend how that would add to our understanding of the statute. The majority surely cannot hope to invoke the rule that where "'Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.'" *Molzof* v. *United States*, 502 U. S. 301, 307 (1992) (quoting *Morissette* v. *United States*, 342 U. S. 246, 263 (1952)). The quoted phrase from the APHA–CDC publication can hardly be called a "ter[m] of art"—let alone a term in which is "accumulated the legal tradition and meaning of centuries of practice." See also *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329 (1981) (applying the rule to "terms that have accumulated settled meaning under either equity or the common law").

must have the "purpose . . . to protect health and safety by preventing dwelling overcrowding." *Ibid.*

Of course, the majority does not contend that the language of § 3607(b)(1) precisely describes the category of zoning rules it has labeled "maximum occupancy restrictions." Rather, the majority makes the far more narrow claim that the statutory language "surely encompasses" that category. *Ante,* at 734. I readily concede this point.[6] But the obvious conclusion that § 3607(b)(1) encompasses "maximum occupancy restrictions" tells us nothing about whether the statute *also* encompasses ECDC § 21.30.010, the zoning rule at issue here. In other words, although the majority's discussion will no doubt provide guidance in future cases, it is completely irrelevant to the question presented in *this* case.

The majority fares no better in its treatment of "family composition rules," a term employed by the majority to describe yet another invented category of zoning restrictions. Although today's decision seems to hinge on the majority's judgment that ECDC § 21.30.010 is a "classic exampl[e] of a . . . family composition rule," *ante,* at 735, the majority says virtually nothing about this crucial category. Thus, it briefly alludes to the derivation of "family composition rules" and provides a single example of them.[7] Apart from these two references, however, the majority's analysis consists

---

[6] According to the majority, its conclusion that § 3607(b)(1) encompasses all "maximum occupancy restrictions" is "reinforced by" H. R. Rep. No. 100–711, p. 31 (1988). See *ante,* at 734, n. 8. Since I agree with this narrow conclusion, I need not consider whether the cited Committee Report is either authoritative or persuasive.

[7] See *ante,* at 733 ("To limit land use to single-family residences, a municipality must define the term 'family'; thus family composition rules are an essential component of single-family residential use restrictions"); *ante,* at 734 ("East Cleveland's ordinance 'select[ed] certain categories of relatives who may live together and declare[d] that others may not'; in particular, East Cleveland's definition of 'family' made 'a crime of a grandmother's choice to live with her grandson'" (quoting *Moore* v. *East Cleveland,* 431 U. S. 494, 498–499 (1977) (plurality opinion))).

*solely* of announcing its conclusion that "the formulation [of § 3607(b)(1)] does not fit family composition rules." *Ibid.* This is not reasoning; it is *ipse dixit.* Indeed, it is not until *after* this conclusion has been announced that the majority (in the course of summing up) even defines "family composition rules" at all. See *ibid.* (referring to "rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters can contain").

Although the majority does not say so explicitly, one might infer from its belated definition of "family composition rules" that § 3607(b)(1) does not encompass zoning rules that have one particular purpose ("to preserve the family character of a neighborhood") or those that refer to the qualitative as well as the quantitative character of a dwelling (by "fastening on the composition of households rather than on the total number of occupants living quarters can contain"). *Ibid.* Yet terms like "family character," "composition of households," "total [that is, absolute] number of occupants," and "living quarters" are noticeably absent from the text of the statute. Section 3607(b)(1) limits neither the permissible purposes of a qualifying zoning restriction nor the ways in which such a restriction may accomplish its purposes. Rather, the exemption encompasses "any" zoning restriction—whatever its purpose and by whatever means it accomplishes that purpose—so long as the restriction "regard[s]" the maximum number of occupants. See generally *supra,* at 739–742. As I have explained, petitioner's zoning code does precisely that.[8]

---

[8] All that remains of the majority's case is the epithet that my reasoning is "curious" because it yields an "exception-takes-the-rule reading" of § 3607(b)(1). *Ante,* at 737, n. 11. It is not clear why the majority thinks my reading will eviscerate the FHA's antidiscrimination prescriptions. The FHA protects handicapped persons from traditionally defined (intentional) discrimination, 42 U. S. C. §§ 3604(f)(1), (2), and three kinds of specially defined discrimination: "refusal to permit . . . reasonable modifications of existing premises"; "refusal to make reasonable accommodations in rules, policies, practices, or services"; and "failure to design and con-

In sum, it does not matter that ECDC § 21.30.010 describes "[f]amily living, not living space per occupant," *ante*, at 737, because it is immaterial under § 3607(b)(1) whether § 21.30.010 constitutes a "family composition rule" but not a "maximum occupancy restriction." The sole relevant question is whether petitioner's zoning code imposes "any . . . restrictions regarding the maximum number of occupants permitted to occupy a dwelling." Because I believe it does, I respectfully dissent.

---

struct [multifamily] dwellings" such that they are accessible and usable, §§ 3604(f)(3)(A), (B), (C). Yet only *one* of these four kinds of discrimination—the "reasonable accommodations" prescription of § 3604(f)(3)(B)—is even arguably implicated by zoning rules like ECDC § 21.30.010. In addition, because the exemption refers to "local, State, or Federal restrictions," even the broadest reading of § 3607(b)(1) could not possibly insulate *private* refusals to make reasonable accommodations for handicapped persons. Finally, as I have already noted, see *supra*, at 741, n. 3, restrictions must be "reasonable" in order to be exempted by § 3607(b)(1).