IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 95-10851

———————————

ELDERHAVEN, INC.

Plaintiff-Appellant,

versus

CITY OF LUBBOCK, TX, a Municipal Corporation;
CITY PLANNING AND ZONING COMMISSION,
a Political Subdivision of the
City of Lubbock, Texas;
ZONING BOARD OF ADJUSTMENT OF THE
CITY OF LUBBOCK, TEXAS,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Northern District of Texas

———————————

October 11, 1996

Before GARWOOD, HIGGINBOTHAM, and BENAVIDES, Circuit Judges:

PATRICK E. HIGGINBOTHAM:

Today we affirm a summary judgment granted to a Texas municipality dismissing claims of discrimination against handicapped persons under the Fair Housing Act. We are persuaded that the City in administering its zoning laws has reasonably accommodated the needs of the company complaining here.

I

In the late 1980s and early 1990s, Art and Mary Griffin founded Elderhaven, Inc., a corporation organized for the purpose

of providing alternative living arrangements for elderly disabled persons.  In November of 1990, Elderhaven bought a house with an address of 2510 Slide Road in a portion of the City of Lubbock zoned R-1.  Elderhaven planned to establish a shared living residence for several elderly adults with mental or physical disabilities.  Lubbock law at the time limited the use of land within the R-1 designation to single-family residences, and defined family as (i) any number of persons related by blood, marriage, or adoption, or (ii) any two unrelated persons living and cooking together as a unit.  Because its proposed use was not in accordance with Lubbock zoning laws, Elderhaven began a dialogue with City officials regarding its plans for the Slide Road structure and regarding the  City's duty to comply with the Fair Housing Act, 42 U.S.C. § 3601-31.  This interaction included an application for a variance from the Lubbock Zoning Board of Adjustment, which was denied, and finally resulted in the 1991 passage of Lubbock Ordinance 9489.

Elderhaven's focus is upon Ordinance 9489.  The parties agree that Ordinance 9489 amends the Code of Ordinances, City of Lubbock so as to provide the following regulatory scheme of uses within the R-1 zone.  Any group of persons related by blood, marriage, or adoption, whether disabled or non-disabled, may live together as a single family in a residence.  One or two persons, disabled or non-disabled, who are not related by blood, marriage, or adoption may live and cook together as a single family unit.  Three or four persons disabled but not related by blood, adoption, or marriage,

2

may live together in a residence so long as they first obtain a permit from the director of planning of the City of Lubbock. Groups of five or more disabled persons may apply for a special exception from the ZBA to the otherwise applicable limits on the use of plots of land within the R-1 zone. Lubbock law prohibits all other uses unless the landowner obtains a variance.

Ordinance 9489 outlines the requirements for a permit applicable to a group of three or four unrelated and disabled persons wishing to live together. An application for a permit must include a rudimentary site plan illustrating compliance with minimum square footage requirements for bedrooms. No bedroom may house more than two persons. The application must designate a person labeled a "care-provider," who will be responsible for compliance with the Ordinance, and the "care-provider" must have a "separate bedroom." The relevant City of Lubbock authorities must conduct a health inspection of the facility. A group living arrangement for the disabled may not be located within 600 feet of another group living arrangement already in place.[1] This permitting process takes between 10 and 14 days to complete. Once issued, a permit may be renewed annually so long as the "care-provider" keeps the facility in compliance with the Ordinance.

Within its statutory context, the portion of the Ordinance requiring groups of five or more disabled individuals to request a special exception functions as follows. An application including

---

[1] Originally, the Ordinance required a $25.00 permit fee application. The parties agree that the City no longer collects this fee.

3

a site plan is submitted; the relevant Lubbock authorities must conduct a health and fire inspection; all persons owning property within 200 feet of the structure at issue are given notice; and the ZBA holds a public hearing at which all persons may express an opinion before making a decision on whether to grant a special exemption. The Ordinance subjects a facility attempting to qualify for a special exemption to all the requirements of the permitting process described above except three: the minimum square footage per bedroom, the limit of two persons per bedroom, and the designation of a separate bedroom for the "care provider."[2]

Late in 1991, as Ordinance 9489 took effect, Elderhaven applied for a special exemption allowing it to house up to 12 elderly disabled individuals as its Slide Road residence. In early 1992, Lubbock authorized Elderhaven to house 10 persons at Slide Road. Contending that Ordinance 9489 discriminated against persons with disabilities, Elderhaven sued the City in federal court seeking declaratory and injunction relief. Two organizations advocating rights for the disabled intervened as plaintiffs.

Discovery in the case included several depositions,

---

[2] Lubbock Code § 29-8(f)(1) provides a series of substantive criteria for the ZBA's use in deciding whether to grant a special exception. On the basis of the record and legal materials available to us, it is unclear whether Ordinance 9489's special exemption procedure supplants section 29-8(f)(1)'s substantive criteria or supplements them. For the purposes of this appeal, we will assume that an applicant must clear both hurdles to attain a special exemption. We note, however, that it may be possible to envision circumstances in which a strict and onerous application of section 29-8(f)(1) to a proposed facility for the disabled might produce tension with the FHA's mandate that municipalities reasonably accommodate the needs of the disabled.

4

affidavits, and interrogatories clarifying how the City administers the Ordinance. Officials conducting fire and health inspections provided evidence as to the purpose of those inspections; generally stated, these inspections are designed to assure that the facilities comply with certain minimal fire and health requirements such as food and garbage sanitation, water supply, emergency exits, and alarms. City officials use forms available for other purposes to conduct their inspections.

In response to questions from plaintiffs' counsel designed to illustrate the inappropriateness of some of the Ordinance's criteria to a situation involving groups of persons having minimally disabling handicaps, City officials testified at deposition that, in some cases, certain requirements of the Ordinance would simply be waived or interpreted in such a way as to minimize their importance. One City official testified, for instance, that the requirement that a "care-provider" have a "separate bedroom" might be met in certain situations by designating a house's living room as that separate bedroom. When confronted with a hypothetical involving four able-bodied deaf persons desiring to live together in an R-1 district, another City official suggested that one of the deaf residents could be designated as the "care provider," suggesting that in this circumstance the "care provider" is nothing more than the person the City considers to be on the hook for assuring full compliance

with the applicable terms of the Ordinance.[3] Another City official interpreted the term "separate bedroom" as, under certain circumstances, allowing the care provider to live in a bedroom with a disabled person. Most officials addressing the subject agreed that the "care provider" need not actually live in the specified room, if circumstances suggested that such a requirement would be inappropriate.

In the midst of litigation in this case, Elderhaven bought a second house at 4713 22nd Street, Lubbock. After one unsuccessful attempt to obtain City permission to house additional elderly disabled individuals at 22nd Street, Elderhaven applied for and obtained a special exemption allowing it to house eight such persons at this residence.

The district court granted summary judgment to the defendants. Elderhaven pursued an appeal, but the intervenor-plaintiffs in the litigation did not. On appeal, we vacated the district court's decision for reconsideration in light of City of Edmonds v. Oxford House, Inc., 115 S. Ct. 1776 (1995). On remand, the district court again granted summary judgment for the defendants, this time on two separate grounds. First, the court found that Ordinance 9489 constituted a maximum occupancy restriction within the meaning of 42 U.S.C. § 3607(b)(1), despite City of Edmonds' narrow construction of that exception. Second, the district court found

---

[3] Interrogatory answers from the City clarified that, in general, the term "care provider" denotes simply the person the City considers responsible for assuring compliance with any permit or special exemption requirements.

6

that Ordinance 9489 was a reasonable accommodation within the meaning of 42 U.S.C. § 3604(f)(3). Elderhaven, joined in part by the United States as amicus curiae, again appealed.

We hold that, on the basis of the record currently before us, Elderhaven has not borne its burden of proving that the City of Lubbock has failed to reasonably accommodate the needs of the disabled in its regulation of housing. We make no comment on the correctness of the district court's decision regarding section 3607(b)(1)'s exception for maximum occupancy requirements, nor do we intimate any view as to whether the Ordinance is susceptible to illegal application by Lubbock officials.


II

42 U.S.C. § 3604(f)(1) makes unlawful discrimination against the disabled in housing. 42 U.S.C. § 3604(f)(3)(B) defines discrimination as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." The question is thus whether Lubbock's ordinance, as it operates in the context of Lubbock's overall zoning law, constitutes a reasonable accommodation of the housing needs of the disabled.

Initially, we reject the suggestion of certain courts that a Fair Housing Act defendant bears the burden of proof on the question of reasonableness. See <u>Hovsons, Inc. v. Township of Brick</u>, 89 F.3d 1096, 1103 (3d Cir. 1996). The text of the Fair

Housing Act provides no hint that Congress sought to change the normal rule that a plaintiff bears the burden of proving a violation of law by a preponderance of the evidence. Our case law under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, supports the imposition of the burden of proof on Elderhaven. McGregor v. Louisiana State University Board of Supervisors, 3 F.3d 850, 859 n.11 (5th Cir. 1993), cert. denied, 510 U.S. 1131 (1994).

Elderhaven has not borne its burden to raise a genuine issue of fact as to whether the City has applied Ordinance 9489 in a manner that fails to reasonably accommodate the needs of the disabled. We assume that the plaintiffs are correct that a reasonable accommodation is one that does not place an undue burden upon the targeted government entity, despite its indeterminacy. We need not disagree with the plaintiffs that the terms of Ordinance 9489, if applied rigidly and in a manner blind to the varying circumstances attending the needs of persons with disabilities, might constitute a violation of the Fair Housing Act. The example of the plaintiff illustrates their point of a permitting requirement and health inspection as applied to a group of three or four deaf persons wishing to live together in an R-1 zone. Even here, however, the fact that the residents are deaf may give the City a legitimate cause for concern in terms of safety, as, for instance, unmodified smoke alarms could not warn occupants of the danger of fire. We might also imagine a permitting process causing delays that inhibit the disabled from competing in Lubbock's tight rental market. Our task, however, is to decide concrete disputes.

It is not to imagine.

The undisputed evidence in the record reflects the City's willingness to interpret its ordinance flexibly and in accordance with the circumstances of each case. Such flexibility may be an essential component of a process designed to provide reasonable accommodation and to operate in the marginal circumstances of the market. The record reflects, for instance, that the City no longer collects the permit application fee specifically required by the text of the ordinance.

We assume that plaintiffs are correct that a municipality may violate the Fair Housing Act by placing unduly burdensome conditions upon a proposed residence for the disabled. See, e.g., Marbrunak, Inc. v. City of Stow, 974 F.2d 43, 45 & n.1 (6th Cir. 1992). The City's permitting process as it has functioned in the past is relatively rapid, and its inspections and building requirements are not unusually burdensome. The City's interest in these inspections and the permitting process in general is apparent from the face of the Ordinance's preamble, which states, "WHEREAS, it has been the experience of the City of Lubbock that unregulated and unlicensed homes for handicapped persons may not necessarily provide adequately for the health and safety of the residents." Again, the permitting process and the inspections might be wholly inappropriate for certain situations, but the record illustrates the City's willingness to adjust under these circumstances.

The City has granted almost all of the permit and special exemption applications it has received. Elderhaven's arguments

9

depend almost entirely on unrealized fear of possible application of the Ordinance. As yet, Elderhaven's only real concrete complaint is that it sought permission from the City to house 20 residents, and the City permitted only 18. We recognize that the economics of group living arrangements often require a critical mass of residents in order to make feasible the type of alternative living arrangements that the Fair Housing Act was designed to encourage. Elderhaven has never alleged, much less proven, that 20 is that critical number.

We iterate that our decision in this case is limited to the record before us, and we have relied on the City's past record of flexible interpretation and its current intention to continue this policy. In sum, our question is whether the City of Lubbock has reasonably accommodated handicapped persons in its zoning decisions. The ordinance sets a framework for decision-making, but is only part of a process. Whatever might have been, Elderhaven has failed to raise a genuine issue of material fact as to a violation of its rights under the Fair Housing Act.

AFFIRMED.