Kenneth BLACK, Barbara Black, Tracey Crandall, Jack Jabrosky, Pamela Jabrosky and Debra Taylor, Plaintiffs,

v.

**VILLAGE OF PARK FOREST,**
Defendant.

No. 95 C 7530.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 23, 1998.

Gilbert Marcus Cole, Richard T. Morrison, Mayer, Brown & Platt, Chicago, IL, Scott Bullock, William H. Mellor, III, Institute for Justice, Washington, DC, for Plaintiffs.

Robert H. Ellch, Anthony Gael Scariano, Scariano, Kula, Ellch & Himes, Chtd., Chicago, IL, Kelly Ann Ellch, Kathleen Field Orr, Scariano, Kula, Ellch & Himes, Chtd., Chicago Heights, IL, Beth Anne Janicki, Illinois Municipal League, Springfield, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

Plaintiffs Jack Jabrosky, Pamela Jabrosky, and Debra Taylor[1] ("plaintiffs") have brought this action under 42 U.S.C. § 1983 against the Village of Park Forest ("the Village"), challenging the constitutionality of the Village's annual inspections of rented single-family homes and of certain provisions of the Village's Housing Code.[2] The Village is a

---

1. Kenneth Black, Barbara Black, and Tracey Crandall were also among the original plaintiffs. They were dismissed from the case when they relocated from the Village of Park Forest.

2. The relevant provisions of the Village's Housing Code are set out below:

Sec. 16–3. **Inspections authorized; right of entry.**

(a) The administrative official, or his authorized representative, is hereby authorized and directed to make inspections to determine the condition of dwellings, dwelling units, rooming units and premises located within the village in order that he may perform his duty of safeguarding the health and safety of the occupants of dwellings and of the general public.

(b) For the purpose of making such inspections the administrative official, or his authorized representative, is hereby authorized to enter, examine and survey at all reasonable times all dwellings, dwelling units, rooming units and premises.

(c) The owner or occupant of every dwelling, dwelling unit and rooming unit or person in charge thereof, shall give the administrative official or his authorized representative free access to such dwelling, dwelling unit or rooming unit and its premises, at all reasonable times, for the purpose of such inspection, examination and survey upon presentation of proper identification and a schedule of the specific areas and facilities to be inspected, examined and surveyed. If any owner or oc-

home-rule municipality incorporated and operating pursuant to Article IV. Section VI of the Illinois Constitution. It is a "person" within the meaning of 42 U.S.C. § 1983. The plaintiffs are tenants who reside in rented single-family homes within the Village.

In their complaint, plaintiffs attack the constitutionality of the inspection program and the Housing Code provisions on four grounds, all of which are based on the Fourth Amendment as incorporated by the Fourteenth Amendment. Section 16–3(c) of the Housing Code requires the owner or occupant of a property to provide inspectors access to the property. In Count I, plaintiffs argue that § 16–3(c) of the Housing Code allows the Village to seek consent from the landlord to perform inspections without a warrant and that this provision therefore violates the exclusive right of tenants to decide whether or not to consent to a housing inspection. If a landlord or tenant objects to the inspection, § 16–3(c) requires the Village to obtain either an administrative search warrant or a court order before conducting the inspection. In Count II, plaintiffs contend that the inspection program is unconstitutional because the Village is permitted to obtain a search warrant based merely upon the passage of time between inspections. Plaintiffs argue that a more rigorous standard of probable cause should apply, under which the Village would have to demonstrate a reasonable basis for believing

cupant of any dwelling, dwelling unit or rooming unit or person in charge thereof refuses to permit free access or entry into such dwelling, dwelling unit or rooming unit or any part thereof with respect to which an inspection authorized by this Code is sought to be made, the administrative official shall petition and obtain a warrant to inspect or an order from a court of competent jurisdiction directing compliance with the inspection requirements of this chapter.

(d) Every occupant of a dwelling or dwelling unit shall give the owner thereof or his agent or employee access to any part of such dwelling or dwelling unit or its premises at all reasonable times for the purpose of making such repairs or alterations as are necessary to effect compliance with the provisions of this chapter or with any lawful rule or regulation adopted or order issued pursuant to the provisions of this chapter.

Sec. 16–4. Certificate of occupancy.

(a) It shall be unlawful for any family unit to occupy a dwelling unit within the village by rental, lease, purchase or otherwise or for any owner or agent thereof to permit the occupation of a dwelling unit within the village by any family unit for any purpose until a certificate of occupancy has been issued by the Village Building Commissioner, as hereinafter provided:

(1) For any owner-occupied dwelling unit, a certificate of occupancy is required for each new family unit to occupy a dwelling unit and every separate occupancy of any family unit whether as a result of sale, inheritance, assignment or gift.

(2) In the case of rental or lease of a dwelling unit, a certificate of occupancy is required each calendar year either prior to the time a new family unit occupies the dwelling unit or, if no new occupancy occurs, prior to December 31, unless an annual inspection has been made pursuant to the requirements of Sec. 19–220 of this Code.

(b) A certificate of occupancy shall be issued by the Village Building Commissioner upon a determination that there are no violations of any applicable provision of this Code in the interior and exterior of the dwelling unit after inspection has been made in accordance with the following:

(1) the Building Commissioner or his designated department employee inspects the interior and exterior of the dwelling unit to ascertain only visible code violations; or

(2) the Building Commissioner receives a written report of an independent housing inspection contractor from a nationally recognized private professional inspection association and/or organization and familiar with all applicable provisions of the Code of Ordinances of the Village of Park Forest.

(c) Application for a certificate of occupancy shall be made to the Building Commissioner as follows:

\*    \*    \*    \*    \*    \*

(2) For any dwelling unit not owner occupied, the owners shall make application to the Building Commissioner for a certificate of occupancy for each dwelling unit within no less than seven (7) days and no more than three (3) months prior to occupancy by any new family unit. The application shall state the name and number of occupants and term of occupancy. The application shall be accompanied by an inspection fee of one hundred dollars ($100.00) in the case of a building containing one dwelling unit and fifty dollars ($50.00) per dwelling unit where a building contains more than one (1) dwelling unit. In addition to the aforesaid inspection fees, a charge of $60.00 shall be imposed in any case where entry to a dwelling unit for purposes of inspection requires the administrative official of the Village to petition and obtain a warrant from a court of competent jurisdiction, pursuant to Sec. 16–3 hereof.

\*    \*    \*    \*    \*    \*

that a housing code violation is present in order to obtain a warrant. In Count III, plaintiffs argue that the inspection program is unconstitutional because it is not based on reasonable legislative or administrative standards. Finally, in Count IV, plaintiffs assert that § 16–4(c)(2) of the Housing Code impermissibly burdens the exercise of the Fourth Amendment right to demand a search warrant by charging a $60 fee when the Village is unable to obtain consent and is forced to obtain a search warrant.[3]

Plaintiffs and the Village have each moved for summary judgment on all four counts. In support of their motion, plaintiffs submitted a joint stipulation of facts. In addition to the joint stipulation of facts, the Village filed a supplemental statement of facts in support of its motion. Plaintiffs dispute many of the facts in the Village's supplemental statement. Nevertheless, plaintiffs and the Village contend that there are no disputed issues of material fact and that the claims are ripe for summary judgment.

### FACTS [4]

In January 1994, the Village amended the Housing Code to authorize inspections by an administrative official of rental properties at "all reasonable times." The annual rental inspection program at issue here[5] is in addition to the Village's change-of-occupancy inspection program, which applies to both rental and owner-occupied properties. Prior to January 1994, the Village inspected rental properties only after tenants moved out and before new tenants moved in.

The Village conducts routine annual inspections of the interior of rented, non-owner-occupied single-family homes. The Village does not conduct such inspections of occupied condominiums, duplexes, units in multi-family apartment complexes, or owner-occupied homes, but conducts exterior inspections and interior common area inspections of these types of properties. Inspections of these types of properties also occur during licensing and reoccupancy permitting and upon tenant complaint.

The Village requires that the owner of a rented, single-family home ("the landlord") provide access on demand to all parts and areas of the property for the inspection. The landlord is charged an inspection fee of $100 per inspection. Under § 16–3(c) of the Housing Code, if a landlord or tenant objects to the inspection, the Village must obtain either an administrative search warrant or a court order. Search warrants issued under § 16–3(c) are served on the occupants of the house by an administrative official and a police officer. If the occupant is not at home, a notice is posted on the door of the house to inform the occupant of the existence of the search warrant.

The Village amended the Housing Code in June 1995 to charge an additional $60 fee if a landlord or a tenant requires the Village to obtain a search warrant. Housing Code §§ 16–4(c)(1) and (2). The $60 fee is charged to the landlord, regardless of whether it is the landlord or the tenant who objects to the search.

Plaintiffs are individuals who currently rent single-family homes in the Village. As such, they are subject to inspections under the Village's Housing Code. They do not want to have their homes searched by the Village without either their explicit consent or a valid search warrant issued upon probable cause.

The Village contacted Taylor's landlord to arrange an inspection. When the landlord

---

3. Plaintiffs purport to challenge a similar $60 fee imposed by § 16–4(c)(1) when the Village is forced to obtain a warrant to inspect an owner-occupied property. The plaintiffs here are tenants of single-family homes and so lack standing to challenge § 16–4(c)(1).

4. With the exception of the discussion regarding the application of the inspection program to the individual plaintiffs, the facts are taken almost verbatim from the parties' joint stipulation of facts.

5. Although inspections are authorized by §§ 16–3(a) and (b) of the Housing Code, these sections do not refer to any specific inspection programs. They also do not set out the terms or conditions of inspection programs implemented by the Village. The details about how the inspection program operates are taken from the parties' submissions.

objected, the Village obtained a warrant. The warrant was not based on complaints by Taylor nor was it based on a belief that there were Housing Code violations in Taylor's house. The warrant was based on the Village's allegation that an administrative inspection of Taylor's home had not occurred within the past year. Taylor was not present when the Village inspector went to her home. The inspection did not occur, and the inspector left a notice informing Taylor of the search warrant. The Village did not attempt to re-serve the warrant. Instead, the Village filed a petition for rule to show cause in the Cook County Circuit Court asking that Taylor, her landlord, and her 12–year old daughter. Afton Brown, be held in contempt and imprisoned for a minimum period of 24 hours. The Village states that it was not aware that Brown was Taylor's 12–year old daughter. The contempt proceedings have been stayed pending the outcome of this litigation.

The Jabroskys' landlord objected to the inspection of the Jabroskys' property. The Village obtained a search warrant and served it on the Jabroskys. When the Jabroskys objected to the search, the inspector did not perform the inspection. However, the Jabroskys later allowed their home to be inspected.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The evidence must be considered in the light most favorable to the non-moving party and all inferences must be resolved in that party's favor. *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 511 (7th Cir.1996). Of course, since plaintiffs and the Village have each moved for summary judgment, the court must determine if either side is entitled to summary judgment.

**6.** An exception to the warrant requirement arises when there is probable cause for the search, and exigent circumstances prevent the government from obtaining a search warrant. *See Pratt v.*

### 1. *Count I—Consent*

█ Plaintiffs claim that the Housing Code unconstitutionally infringes the tenant's exclusive right to consent or withhold consent to an inspection. In *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Supreme Court held that if a tenant does not consent to a search of his or her home, government officials must obtain a search warrant before conducting an administrative search or inspection.[6] Numerous cases have made clear that a landlord's consent is insufficient to authorize a search of a tenant's home; the right to consent or not consent to a search belongs to the tenant. *See, e.g., Chapman v. United States,* 365 U.S. 610, 616–17, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *United States v. Chaidez,* 919 F.2d 1193, 1201 (7th Cir.1990).

█ Plaintiffs argue that § 16–3(c) permits the Village to obtain consent for an inspection from the landlord, without ever obtaining the consent of the tenant. Section 16–3(c) provides in pertinent part:

The owner or occupant of every dwelling ... shall give the administrative official or his authorized representative free access to such dwelling .... If any owner or occupant of any dwelling ... refuses to permit free access or entry into such dwelling ... with respect to which an inspection authorized by this Code is sought to be made, the administrative official shall petition and obtain a warrant to inspect or an order from a court of competent jurisdiction directing compliance with the inspection requirements of this chapter.

Plaintiffs attack the constitutionality of § 16–3(c) both on its face and as applied to them. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In arguing the facial unconstitutionality of § 16–3(c), plaintiffs emphasize its disjunctive language:

*Chicago Housing Authority,* 848 F.Supp. 792, 795 (N.D.Ill.1994). This exception is not at issue in this litigation.

"The owner *or* occupant of every dwelling ... shall give the administrative official or his authorized representative free access to such dwelling ...." Plaintiffs contend that § 16–3(c), on its face, permits the Village to bypass the tenant—the "occupant"—and obtain consent for the inspection from the owner.

In response, the Village argues that plaintiffs misconstrue § 16–3(c). The Village notes that § 16–3(c) does not apply only to the annual inspection of rented single-family homes. It also applies to other inspections, such as inspections of a rental property before new tenants move in. Therefore, the Village argues that the disjunctive language in § 16–3(c) merely gives the Village the flexibility to obtain consent from the proper party. When the property is unoccupied or is occupied by the owner, the owner may properly consent to an inspection.

The court agrees with the Village that § 16–3(c) may be constitutionally applied in some circumstances, satisfying the lenient standard announced in *Salerno* for repelling a facial challenge. Thus, the Village's motion for summary judgment on Count I is granted as to the facial challenge.

■ However, in arguing for the facial validity of § 16–3(c), the Village appears to undermine its defense to plaintiffs' as applied challenge. The Village seems to acknowledge that when a property is occupied by a tenant, then the tenant (and only the tenant) has the authority to consent to an inspection. The Village concedes that nowhere in § 16–3(c) is there an explicit requirement that the Village must obtain the consent of the tenant rather than the owner when a rental property is occupied by a tenant. To overcome this apparent defect, the Village notes that in reviewing a facial challenge to the validity of a statute, a court must "consider any limiting construction that [the Village] has placed on

the law, including any administrative interpretation or implementation of the law." *Ward v. Rock Against Racism,* 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Citing the affidavit of the director responsible for overseeing the annual inspection program, the Village claims that it "will not conduct the inspection without the tenant's knowledge of the inspection and failure to object to the same." As plaintiffs are quick to point out, however, knowledge is not the same as consent.

■ The evidence raises substantial questions as to whether § 16–3(c) is applied in a constitutional manner for inspections of rented single-family homes. In explaining the operation of the inspection program, the Village admits that it initially contacts the landlords to give notice of the inspections and schedule the inspections, but the Village asserts that it does not attempt to conduct the inspections without notifying the tenants of rental properties. However, the Village does not offer any evidence that it attempts to contact tenants to obtain their consent to a search. Nor does the Village offer any evidence that it directs landlords to contact their tenants to attempt to obtain their consent.[7] In at least one instance, it appears the Village relied on a representation by the landlord that the tenant knew about the inspection.[8] While it may be reasonable in some circumstances for the Village to rely on representations by a landlord or by another third-party that a tenant has consented to an inspection, the Village claims only that tenants are notified and thereby are given the opportunity to object. Knowledge of and acquiescence to a search do not necessarily amount to consent. *See Bumper v. Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (rejecting claim of con-

---

7. Plaintiffs illustrate the shortcomings by comparing the Village's § 16–3(c) with § 17.12.1(c) of Kalamazoo's housing code. Kalamazoo's provision specifically requires the landlord to inform the tenant of a scheduled inspection and to request permission from the tenant that the inspector be permitted to enter the property if the tenant is not home at the time of the inspection.

*See Rustrom v. City of Kalamazoo,* No. 95–CV–158 (W.D.Mich. Aug. 2, 1996).

8. This evidence involves former plaintiff Tracey Crandall. Although Crandall is no longer a plaintiff, the evidence is part of the record and is relevant for understanding how the inspection program is conducted.

sent where official claimed he had warrant, noting that burden of proving free and voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *see generally Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (finding that determination of consent must be based on totality of surrounding circumstances). *But see E.Z. v. Coler,* 603 F.Supp. 1546, 1556–58 (N.D.Ill. 1985) (holding that standard for consent to administrative searches is less stringent, finding consent despite plaintiffs' claims that they were not specifically asked for consent).

The Village argues that plaintiffs should not be able to challenge § 16–3(c) based on "speculation and conjecture of the Plaintiffs that sometime in the future, the Village's application of the ordinance may be questionable." It is true that plaintiffs have not established that their homes were searched based only on the consent of the landlord. Plaintiffs' challenge, however, is based on the words of the Housing Code, the Village's own evidence as to how the program operates, and the plaintiffs' experience with the ordinance. Furthermore, it is important to note that plaintiffs are not seeking damages for allegedly unlawful inspections in the past, but instead are seeking declaratory and injunctive relief for the unconstitutional application of the inspection program in the future. The plaintiffs live in rented single-family homes in the Village and therefore would be subject to the annual inspections in the future. Thus, this court concludes that, at a minimum, plaintiffs have established a question of material fact as to whether § 16–3(c) is applied (and will be applied to them in the future) in a constitutional manner.

However, plaintiffs' showing is not sufficient for them to succeed on their claim for summary judgment. In their submissions in support of their motion, plaintiffs nowhere establish that the Village has in fact searched any rented single-family homes based only on the consent of the owner. The current record is inadequate for determining if the Village obtains the consent of tenants of rented single-family homes before conducting warrantless inspections. Thus, on the as applied challenge to § 16–3(c), the plaintiffs'

and Village's motions for summary judgment are denied.

2. *Counts II—Probable Cause*

■ In Count II, plaintiffs allege that the inspection program violates the Fourth Amendment because the Village may obtain a search warrant based merely upon the passage of time between inspections rather than upon "traditional probable cause requirements." In their briefs, plaintiffs collaborate on their view of traditional probable cause, arguing that to obtain a search warrant, the Village should be forced to demonstrate a reasonable belief that there are housing code violations in the home for which the warrant is sought. To the extent that plaintiffs are arguing that all warrants for administrative searches of residences must be based on specific knowledge of code violations at the properties to be searched, the Supreme Court's decision in *Camara* forecloses plaintiffs' claim. In *Camara,* a tenant sought to enjoin criminal charges for refusing to permit a warrantless inspection of his apartment under the San Francisco Housing Code. The inspector sought entry for a routine annual inspection for possible violations of the Housing Code. The Court found that administrative searches "are significant intrusions upon the interests protected by the Fourth Amendment" and, absent consent, cannot be conducted without a warrant. 387 U.S. at 534, 87 S.Ct. 1727. However, the Court specifically rejected the tenant's claim that "warrants should issue only when the inspector possesses probable cause to believe that a particular dwelling contains violations of the minimum standards prescribed by the code being enforced." *Id.* The Court concluded that

> "probable cause" to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area, but they will not necessarily depend upon

specific knowledge of the condition of the particular dwelling.

*Id.* at 538, 87 S.Ct. 1727. Thus, in the context of administrative searches, the term "probable cause" refers "not to a quantum of evidence [necessary to obtain a warrant], but merely to a requirement of reasonableness." *Griffin v. Wisconsin,* 483 U.S. 868, 877 n. 4, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

However, plaintiffs assert that they are not revisiting law clearly settled by the Supreme Court. Instead, they argue that in evaluating administrative inspections *Camara* established a balancing test in which the need to search is balanced against the intrusion the search entails. 387 U.S. at 537, 87 S.Ct. 1727. Under this balancing test, plaintiffs argue, the significant intrusion caused by the inspections cannot be justified. Plaintiffs point out that the overwhelming majority of court decisions regarding administrative searches involve inspections of commercial properties. Plaintiffs contend that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and that even administrative search cases have at least implicitly recognized that the home is entitled to greater protection than commercial properties. *See, e.g., See v. City of Seattle,* 387 U.S. 541, 545 n. 6, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) ("[t]he reasonableness of warrants issued in advance of inspection [of commercial properties] will necessarily vary with the nature of the regulation involved and may differ from standards applicable to private homes.")

There is no question that the inspections at issue here are intrusive. The Village acknowledges that inspectors search every room in the house, including bedrooms and bathrooms, because violations of the Housing Code may be present in any room. Because residential inspections invade the strong privacy interests of residents in their homes, plaintiffs argue that traditional probable cause must be present in order to obtain a warrant for inspecting residences.

Plaintiffs are correct that the Supreme Court identified a balancing test in *Camara,* in which the need for the search was balanced against the intrusion caused by the search. However, the Court did more than establish the balancing test for administrative searches. The Court performed the balancing. *Camara* involved administrative inspections of residences, and the Supreme Court specifically rejected the claim that the traditional probable cause standard urged here by plaintiffs should apply to such inspections. Thus, to the extent that Count II argues that warrants for all administrative searches of residences must be supported by traditional probable cause, summary judgment is granted to the Village.

3. *Count III—Reasonable Legislative and Administrative Standards*

■ Although traditional probable cause is not necessarily required for administrative inspections of residences. *Camara* does provide some protection to ensure that residential inspections are conducted with respect for the residents' strong privacy interests in their homes. In *Camara,* the Supreme Court held that there is probable cause to issue a warrant to inspect a residential property if "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." 387 U.S. at 538, 87 S.Ct. 1727. In Count III, plaintiffs argue that the housing inspection program does not meet the minimum standard for a valid administrative inspection law because the inspections are not constrained by reasonable legislative and administrative standards.

Although there are few cases discussing administrative inspections of residences, the requirement of "reasonable legislative or administrative standards" seems to offer two types of protection. First, the requirement may serve to protect against properties being unfairly targeted for searches. Thus, the requirement may be read to demand that, absent traditional probable cause, the decision to search a property must be based on some "neutral criteria." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320–21, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).[9] Second, the

9. *Barlow's* involved the warrantless search of a

commercial property pursuant to the Occupa-

requirement may impose an obligation to limit the scope of the inspections to what is necessary to achieve the legitimate goals of the program.[10]

██ In *Camara,* the Court noted that reasonable legislative or administrative standards, "which will vary with the municipal program being enforced, *may* be based upon the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area, but they will not *necessarily* depend upon specific knowledge of the condition of the particular dwelling." 387 U.S. at 538, 87 S.Ct. 1727 (emphasis added). The Village argues that its inspection program is constitutional because probable cause is based on reasonable legislative and administrative standards, including the passage of time between inspections. In the view of this court, however, *Camara* does not establish that the passage of time between inspections will invariably be sufficient to establish probable cause for an administrative inspection of a residence.

One factor that *Camara* indicates may constitute a reasonable legislative or administrative standard is "the nature of the building (e.g., a multifamily apartment house)." *Id.* As can be inferred from the language in *Camara,* it may be reasonable to subject multi-family apartment houses to more intense regulatory scrutiny because of the special problems they pose. Here, however, the

Village conducts annual inspections of the interiors of only rented single-family homes. The interiors of units in multi-family dwellings are not inspected annually, nor are single-family homes occupied by the owners.

The Village argues that tenants, or more specifically, tenants of single-family homes, are not a protected class and so the Village need only show a rational basis for maintaining its inspection program. *See, e.g., Chicago Board of Realtors, Inc. v. City of Chicago,* 819 F.2d 732, 740 (7th Cir.1987) (upholding differential treatment of non-owner-occupied properties against equal protection challenge). The Village argues that its 1979 Housing Code Study and a 1993 update of the Study support its decision to perform annual inspections of the interiors of only rented single-family homes. The Village notes that the Study and the update found that non-owner-occupied properties have a higher incidence of building code violations than owner-occupied properties. This might provide justification for treating rental properties differently from owner-occupied properties, but it does not explain why rented single-family homes are treated differently from rented units in multi-unit dwellings, particularly when the Study indicates that the greatest number of Housing Code violations are found in rental apartment units. *See* Park Forest Housing Code Study (1979), at 2 (noting that 1976 survey found that

---

tional Safety and Health Act (OSHA). In relying on *Camara* to find that a warrant was necessary, the Supreme Court noted that

> [a] warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources such as, for example, dispersion of employees in various types of industries across a given area, and the desired frequency of searches in any of the lesser divisions of the area, would protect an employer's Fourth Amendment rights.

436 U.S. at 321, 98 S.Ct. 1816.

**10.** In requiring a warrant in *Barlow's,* the Court explained the protections offered by a warrant:

> The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral offi-

cer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed. These are important functions for a warrant to perform, functions which underlie the Court's prior decisions that the Warrant Clause applies to inspections for compliance with regulatory statutes.

436 U.S. at 323–24, 98 S.Ct. 1816 (citing *Camara* and *See* ). However, a warrant in the administrative search context can provide protection only when the underlying statute or ordinance indicates the appropriate scope and objectives of the search and identifies the criteria upon which the search is based. As is discussed *infra* at pp. 1227–30, the Housing Code in this case did not do so, and an example of the warrants issued in this case was similarly bereft of limitations on the scope of the searches.

"greatest number of code violations were found in rental apartment units, both old and new").

The Village responds that it has decided to address the problem of code violations in multi-family properties through other methods, including routine inspections of the exteriors and common areas of such properties.[11] This appears to be an important if unintentional concession—the Village acknowledges that for multi-unit dwellings, it uses a less intrusive method to ensure compliance with the Housing Code. Even if the Village were able to offer a rational explanation for treating rented single-family homes differently, this differential treatment is relevant for more than an equal protection challenge.[12] The differential treatment of tenants is significant not only because it may suggest discrimination but because it undermines the argument that the annual searches of rented single-family homes are necessary to ensure compliance with the Housing Code. This differential treatment indicates that there may be other, less intrusive methods for ensuring that rented single-family homes comply with the Housing Code.

Indeed, to evaluate the reasonableness of residential inspections in *Camara*, the Court explicitly employed a test "balancing the need to search against the invasion which the search entails." 387 U.S. at 537, 87 S.Ct. 1727. In concluding that probable cause for a residential inspection "will not necessarily depend upon specific knowledge of the condition of the particular dwelling," the Court identified three factors it found persuasive. First, code-enforcement programs have a long history of judicial and public acceptance. *Id.* Second, there is a strong public interest in preventing dangerous conditions and "it is doubtful that any other canvassing technique would achieve acceptable results." *Id.* Third, "because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy." *Id.* As indicated by the second factor, it was critical to the Court's decision in *Camara* that there was no other method to ensure compliance with the housing code.

Here, however, the Village's own inspection programs indicate that annual inspections of the interiors may not be necessary to ensure that residential properties comply with the Housing Code. The Village apparently does not subject units in multi-family dwellings to annual inspections, even though the Village's own Study indicates that multi-family dwellings have the highest rate of noncompliance with the Housing Code. Nothing in the record indicates why rented single-family homes are singled out for intrusive annual inspections. Thus, on this record, the court must conclude that the differential treatment of rented single-family homes indicates that the Village's inspection program is not justified by reasonable legislative and administrative standards.

As noted by plaintiffs, since *Camara* there have been few decisions involving administrative inspections of residences. In

---

**11.** It is somewhat unclear what inspections are conducted of multi-family dwellings. Section 16–4 of the Housing Code requires a certificate of occupancy every calendar year for rental properties, and it provides that a certificate of occupancy "be issued by the Village Building Commissioner upon a determination that there are no violations of any applicable provisions of this Code in the interior and exterior of the dwelling unit." Housing Code § 16–4(b). Thus, it appears that some type of inspection of the interiors of units in multi-family dwellings is required. However, § 16–4(g) exempts from the certificate of occupancy requirement those multi-family dwellings in which 25 percent of the units are owner-occupied and for which there is a certified inspection program. The Village cites to § 16–15 (which appears to have been renumbered as § 16–6 by Ordinance 1444 in 1991), which sets out the requirements for certification of an inspection program, but the Village has not explained how such certified inspection programs operate and what types of inspections are conducted in such programs. Furthermore, as noted above, the Village stipulated that it does not conduct annual inspections of the interiors of units of multi-family dwellings. Instead, the Village conducts exterior inspections and common area inspections of multi-family apartment complexes. The Village also conducts inspections during licensing and reoccupancy permitting and when a tenant complains.

**12.** Although plaintiffs do not explicitly state that they are bringing an equal protection claim (as well as a Fourth Amendment claim) in Count III, it is suggested by the language in the complaint and the arguments in their briefs.

two instances, courts have rejected attacks on residential inspection programs in which probable cause for a warrant was based on the passage of time between inspections. *See Runstrom v. City of Kalamazoo*, No. 95–CV–158 (W.D.Mich. Aug. 2, 1996); *Smith v. Borough of Glenolden*, 1994 WL 672618 (E.D.Pa. Nov.30, 1994), *aff'd*, 70 F.3d 1257 (3d Cir.1955), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996).[13] Both cases involved inspections of multi-family dwellings, which, as in the Village of Park Forest, available evidence indicates are the properties most likely to contain code violations. It appears that the ordinances in *Runstrom* and *Smith* did not subject rented single-family homes to a more intrusive inspection program than units in multi-family dwellings. Moreover, there is no indication in either case that the tenants argued or offered evidence that there was a less intrusive means of ensuring compliance with the housing code than through an annual inspection of the interior of the properties.

This court's conclusion that the inspection program is not based on reasonable legislative and administrative standards finds additional support in the Village's failure to place appropriate limits on the inspections. Plaintiffs assert that the inspection program is unconstitutional because the Housing Code does not identify the scope, purpose and frequency of the searches. In support of their claim plaintiffs cite administrative inspection cases involving warrantless searches of commercial properties. *See Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Bionic Auto Parts, Inc. v. Fahner*, 721 F.2d 1072 (7th Cir.1983). These cases establish that when a statute permits a warrantless search, the statute must appropriately limit the discretion of the searching officials because there is no warrant to limit the search to a reasonable scope. Here, the Village's Housing Code contains a warrant requirement, so the cases are distinguishable.

Despite the warrant requirement, however, the Village's inspection program presents similar concerns. On its face, the Housing Code does not limit inspections to one per year. Sections 16–3(a) and (b), which authorize the searches, do not limit the Village to annual inspections. The Village argues that § 16–4(a)(2) limits the inspections to one per year. However, this section, which concerns certificates of occupancy, provides only that

> In the case of rental or lease of a dwelling unit, a certificate of occupancy is required each calendar year ... unless an annual inspection has been made pursuant to the requirements of Sec. 19–220 of this Code.

Section 16–4(b)(2) provides that "[a] certificate of occupancy shall be issued by the Village Building Commissioner upon a determination that there are no violations of any applicable provisions of this Code in the interior and exterior of the dwelling unit after inspection has been made ...." These sections require a certificate of occupancy every year and they provide for the conditions for issuing a certificate, but they do not restrict the open-ended authorization to search found in §§ 16–3(a) and (b). The Village contends that if an annual inspection has already occurred, "it is unlikely that a warrant for an additional inspection would be issued, absent a showing of traditional probable cause by the Village." However, the Village does not indicate why it is unlikely, as the provisions that authorize searches, §§ 16–3(a) and (b), contain no limitations on the frequency of the inspections.

The Housing Code also fails to limit the scope of the search. The Village claims that inspections are limited by the Housing Code which, according to the Village, "provides that the inspections will be conducted to insure that no building code violations are present." However, the Housing Code does not so provide. Instead, the Village's inspector is authorized by § 16–3(a) "to make inspections to determine the condition of dwellings, dwelling units, rooming units and premises located within the village in order that he may perform his duty of safeguarding the health and safety of the occupants of

---

**13.** Plaintiffs argue that the *Smith* case should not be deemed persuasive by this court because it is an unpublished opinion. To support this contention, they cite to Rule 53 of the Rules of the United States Court of Appeals for the Seventh Circuit, but Rule 53 concerns unpublished orders issued by the Seventh Circuit, not unpublished opinions by other courts.

dwellings and of the general public." Nowhere in § 16–3(a) does it specify that the inspections are for the purpose of enforcing the specific minimum standards of the building code contained in §§ 16–22 *et seq.* of the Housing Code or any other specified standards.

Criteria for the frequency and scope of the inspections are an essential component of the legislative and administrative standards of which *Camara* speaks. Without such standards, an official issuing a warrant has no standards against which to assess the propriety of a warrant, an official conducting a search has no standards to guide his conduct, and a court reviewing the reasonableness of a search cannot determine if the search was properly limited. Although in theory warrants could properly limit the scope of the searches, it appears that the Village's warrants merely recite the open-ended authorizations found in the Housing Code. The search warrant for the Blacks'[14] home authorized a search

> for the purpose of conducting an inspection to determine the condition of the Premises in order to safeguard the health and safety of the general public, pursuant to Chapter 16, Section 16–3 of the Code of Ordinances of the Village of Park Forest which requires an annual inspection for purposes of renting the Premises.

Affidavit of Richard Reinbold, Ex. A. The warrant refers to an "annual inspection" pursuant to § 16–3, but, as indicated above, § 16–3 does not limit authorization for inspections to annual inspections. The warrant does not identify the various sections of the Housing Code that the Village is trying to enforce. Similarly, the Village's form complaint for a search warrant fails to identify the provisions of the Code that the Village is attempting to enforce.[15]

The Village argues that plaintiffs' claim should fail because there is no evidence that the plaintiffs (or any other tenants) have been subjected to unreasonable searches. However, this misapprehends plaintiffs' challenge. Plaintiffs do not here challenge the searches actually conducted; instead they argue that the inspection program runs afoul of *Camara* because it does not contain reasonable legislative and administrative standards and thus both fails to cabin the discretion of searching officials and fails to inform residents of the appropriate extent of the searches.

"The basic purpose of [the Fourth Amendment], as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara*, 387 U.S. at 528, 87 S.Ct. 1727. Fourth Amendment concerns for privacy and security are profoundly implicated when a government official invades the sanctity of a person's home. The Court in *Camara* recognized the intrusiveness of residential inspections and required government officials to obtain warrants if residents refused to consent. The inspections here are unquestionably invasive. Warrants are served by an inspector and a

---

**14.** As noted earlier, the Blacks were dismissed as plaintiffs after they moved out of Park Forest.

**15.** Plaintiffs have submitted an example of a complaint for inspection warrant, which reads as follows:

> Village of Park Forest, a municipal corporation and home rule municipality, by its Building Commissioner Lawrence G. Kerestes, Complainant, now appears before the undersigned judge of the Circuit Court of Cook County pursuant to § 16–3 of the Code of Ordinances of the Village of Park Forest (a copy of which is attached and incorporated into this Complaint by reference) and requests the issuance of a search warrant to search the premises commonly known as [address].
>
> Complainant says that he has probable cause to believe, based upon the following fact: that

entry should be permitted to the above-referenced premises in order to permit an inspection to determine the condition of said premises in order to safeguard the health and safety of the general public:

1. This annual rental inspection is required under the Park Forest Code of Ordinances (ch. 16, § 16–3) for purposes of renting the referenced premises as required under the aforesaid Code.
2. The current owners of [address] have failed and otherwise refused to allow such an inspection of said premises.
3. No required rental inspection has been conducted for said premises by the Village of Park Forest.
4. An inspection of the premises is necessary to safeguard the health and safety of the general public.

Affidavit of Richard Reinbold, Ex. B.

police officer. Every room in a residence is inspected, including bedrooms and bathrooms.

■ While *Camara* does not require that administrative searches be justified by traditional probable cause, it does require that they be governed by reasonable legislative and administrative standards. This court views the "reasonable legislative and administrative standards" language in *Camara* as meaning, at a minimum, that the authorizing legislation, ordinance or regulation must contain a clear indication of the evils sought to be prevented by the inspection program (presumably supported by some legislative findings indicating that the evils in question exist) and some indication of appropriate parameters for the searches. The Village's program fails on both counts. This court can find nothing in the record to indicate why the Village undertook such an intrusive inspection program solely for rented single-family homes and can find nothing that limits in any way the scope of inspections.

Because the Village's inspection of rented single-family homes is not governed by reasonable legislative and administrative standards, summary judgment on Count III is granted to the plaintiffs.

### 4. *Count IV—Fee as Unconstitutional Condition*

■ Finally, in Count IV, plaintiffs contend that the $60 fee imposed when the Village is forced to obtain a warrant is an unconstitutional burden on the exercise of their Fourth Amendment rights. Neither of the parties identifies any closely analogous cases. Plaintiffs argue that the fee can be analogized the poll tax invalidated by the Supreme Court in *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Plaintiffs note that in criminal law, courts have barred the govern-

ment from punishing defendants for exercising their constitutional rights. *See, e.g., North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (barring state from vindictively imposing harsher sentence after retrial where defendant had won new trial for constitutional errors). Finally, plaintiffs argue that this case is similar to "unconstitutional conditions" cases, in which courts have rejected attempts by the government to use its discretion to grant or deny a benefit to induce waiver of constitutional rights. *See, e.g., Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ While none of these comparisons is directly on point, they support the general principle that the government may not penalize individuals for exercising their constitutional rights. The $60 fee is not a routine inspection fee, which would of course be constitutional. Rather the fee is charged only if the tenant or landlord exercises his or her Fourth Amendment right to require the Village to obtain a search warrant.[16] The Village asserts that the fee bears a reasonable relationship to the cost of obtaining a warrant and that plaintiffs have not demonstrated that the fee has in fact chilled the plaintiffs or anyone else from exercising their Fourth Amendment rights. However, the plaintiffs need not establish that the fee is unreasonable or that it has already chilled the exercise of Fourth Amendment rights. Rather the mere threat that the fee may deter the exercise of Fourth Amendment rights is sufficient.

The more difficult question is whether the plaintiffs are the proper party to challenge the fee. The parties have stipulated that the $60 fee is charged to the landlord and not to the tenant, regardless of whether the tenant or landlord demands a search warrant.[17] No landlord is a party to this action. Neverthe-

---

16. The warrant fee is different from a scheme in which an aggrieved party must pay a filing fee to bring a judicial challenge to an allegedly unconstitutional law or ordinance. *See McKenzie v. City of Chicago*, 118 F.3d 552, 558 (7th Cir. 1997). The filing fee is imposed on all who file actions in court, not just those who are bringing constitutional challenges. In contrast, the $60 fee is imposed here only on those who wish to

exercise their Fourth Amendment rights by demanding that the Village obtain a warrant.

17. The ordinance itself does not identify who is assessed the $60 fee. *See* § 16–4(c)(2). However, the parties have agreed in their joint statement of facts that the $60 fee is charged to landlords.

less, this court concludes that the plaintiffs may properly challenge the $60 fee. As tenants, it is plaintiffs' Fourth Amendment rights that are at issue here. Furthermore, given the relationship between tenants and landlords, it is hardly unreasonable to conclude that the threat of such a fee could inhibit tenants from insisting on search warrants. The court concludes that the provision imposing a $60 fee is unconstitutional on its face. Plaintiffs' motion for summary judgment on Count IV is granted.

### CONCLUSION

For the reasons stated above, the Village's motion for summary judgment [32] is granted in part and denied in part for Count I, granted for Count II, denied for Count III, and denied for Count IV. Plaintiffs' motion for summary judgment [23] is denied for Count I, denied for Count II, granted for Count III, and granted for Count IV. With respect to the Village's motion to strike portions of the affidavits submitted by the plaintiffs, the court did not rely on the challenged portions of the affidavits, and the motion [46] is therefore denied as moot.