The Honorable Chris Steineger State Senator, 6th District State Capitol, Room 523-S Topeka, Kansas 66612
Dear Senator Steineger:
You inquire regarding the legality of certain provisions of Ordinance No. 7326, enacted by the governing body of the City of Lawrence. Specifically, you inquire whether a provision that prohibits a non-occupying property owner from renting a single-family dwelling within a single-family residence district[1] to four or more unrelated individuals violates the Federal Fair Housing Act.[2] You also have concerns regarding provisions in the ordinance that address tenant lists and administrative search warrants.
We begin with your concerns regarding the Federal Fair Housing Act(Act), which prohibits discrimination against persons with disabilities in matters of housing, including rentals.[3]
Ordinance No. 7326, § 6-1306 provides, in part:
 "On and after August 1, 2004, no owner of a single-family . . . dwelling . . . within the City's RS [residential] zoning district . . . shall rent, lease, or sublease a dwelling in a RS zoning district, unless the dwelling is occupied by the owner of the dwelling, if the dwelling will be occupied by more than three (3) unrelated persons who do not constitute a family, as the term `family' is defined by the City's Zoning Code, as amended by Ordinance No. 7323."[4]
Ordinance No. 7323 defines "family," for purposes of residential zoning districts, as:
"1. a person living alone, or
 "2. two or more persons related by blood or marriage, legal adoption, guardianship or other legally authorized custodial relationship, or
 "3. a group of not more than three (3) persons unrelated by blood, marriage, and their children, living together as a single housekeeping unit in a dwelling unit, as distinguished from a group occupying a boarding house, lodging house, motel, hotel, fraternity house or sorority house."
In City of Edmonds v. Oxford House, Inc.,[5] the United States Supreme Court reviewed a similar zoning ordinance that limited the definition of "family" to certain related individuals and groups of five or fewer unrelated individuals. Oxford House, which operated a group home for recovering alcoholics, exceeded the maximum of five unrelated individuals and was issued a citation for violation of an ordinance restricting occupancy of single-family dwellings to "families." Conceding that recovering alcoholics are "handicapped persons" for purposes of the Federal Fair Housing Act, the City sued for a declaration that its restrictions were exempt from the Act's application.[6] The Court construed the Act's exemption for local regulations regarding maximum occupancy restrictions and concluded that the Act's exemption did not apply.[7] Therefore, the Federal Fair Housing Act will prohibit Ordinance No. 7326's rental restriction if such restriction operates to discriminate against persons with disabilities.
K.S.A. 12-736 prohibits municipalities from enacting zoning ordinances that prohibit group homes for the disabled from locating in residential districts. While it was not clear when Ordinance No. 7326 was enacted what impact, if any, the rental restriction would have on such group homes, the City governing body removed any doubt, on January 22, 2002, when it enacted Ordinance No. 7478. Ordinance No. 7478 clearly exempts group homes and adult care homes[8] from the rental restriction provision of Ordinance No. 7326. Therefore, it is our opinion that with the addition of Ordinance No. 7478, the Federal Fair Housing Act's prohibition on housing discrimination based on disability is not violated by Ordinance No. 7326.
The Federal Fair Housing Act also prohibits discrimination based upon "familial status,"[9] which means that a landlord cannot refuse to rent to a parent or person who has legal custody of a child.[10] The definition of "family" in Ordinance No. 7326 does not limit the number of persons related by blood, marriage, legal adoption, guardianship or any other legally authorized custodial relationship who may reside in single family residences and, therefore, does not run afoul of the Act.
Your concern regarding tenant lists is prompted by § 2 of Chapter 147 of the 2001 Session Laws,[11] which became effective on July 1, 2001. Section 2 generally prohibits municipalities from adopting ordinances that require landlords to provide the names of tenants to the municipality.[12] Our understanding is that Ordinance No. 7326, which required landlords to provide such lists to the City, was enacted prior to the effective date of the new law. The City has now rectified the matter by passing Ordinance No. 7478 providing that the City will abide by 2 of Chapter 147 of the 2001 Session Laws.
Your final question evidences a concern with the inspection provisions of Ordinance No. 7326 and whether they pass muster under the Fourth
Amendment to the United States Constitution. In order to understand these provisions, it is necessary to review the ordinance.
Ordinance No. 7326, in addition to limiting the number of unrelated individuals who can reside in rental properties located in residential areas,[13] requires owners of single family dwellings located in residentially zoned areas to obtain an annual rental licensing permit for each rental dwelling prior to leasing.[14] The permit may be revoked if a rental property constitutes a public nuisance.[15] "Public nuisance" is defined as one or more violations of specific ordinances that address noise, environment, litter, zoning, and housing if there is a determination that the violations "adversely affect the public safety of the tenants and the rights of nearby residents to the quiet enjoyment of their property."[16]
In order to ensure compliance, Ordinance No. 7326 contains provisions for periodic inspections and an administrative search warrant, if entry is denied. Sections 6-1304 and 6-1307 provide, in part:
 "6-1304. The public officer shall establish a periodic schedule to provide for the inspection of the exterior and interior of each dwelling . . . [The] inspection shall be conducted at a minimum every three (3) years. As an alternative to City inspection, the City and the property owner may enter into an agreement providing for the private inspection of the property by a certified private inspector to ensure compliance.
. . . .
 "6-1307. Absent emergency circumstances, whenevernecessary to make inspection to enforce any of theprovisions of this Article, or whenever the public officer or his/her authorized representative has reasonable cause to believe that there exists in any dwelling which is required to be licensed . . . any condition or violation which makes such dwelling or premises unsafe, dangerous or hazardous, the publicofficer . . . may enter such building or premises at allreasonable times to inspect . . . provided that suchentry is pursuant to the law, and further provided, if such building . . . be occupied, the public officer shall first present proper credentials and request entry; and if entry is denied, the public officer shallhave authority to seek lawful entry pursuant to anadministrative search warrant or other lawful means."[17]
The United States Supreme Court and the Kansas Supreme Court have addressed Fourth Amendment concerns in relation to administrative search warrant provisions similar to the provisions in Ordinance No. 7326.[18]
In Camara v. Municipal Court of the City and County of San Francisco,[19]
a tenant was prosecuted for refusing to allow a public building inspector to inspect his residence during a routine annual inspection for possible violations of the City's housing code. The Court determined that because administrative searches intrude upon privacy interests protected by theFourth Amendment, absent consent of the resident such searches must be conducted pursuant to a search warrant supported by probable cause. However, the Court rejected the proposition that a warrant can issue only when an inspector believes that a particular dwelling violates an ordinance. Rather, the probable cause necessary to justify issuance of an administrative search warrant is whether "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling."[20]
 "Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling. [The] warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant."[21]
Your concern appears to stem from how the City of Lawrence will implement inspections conducted pursuant to Ordinance No. 7326. In that regard, the Kansas Supreme Court offers guidance in two cases that upheld administrative search warrants. In City of Overland Park v. Niewald,[22]
the Court examined the City's fire prevention code and the administrative plan that implemented its inspection provisions in the face of a Fourth
Amendment challenge. Citing Camara, the Court upheld the City of Overland Park's petition for enforcement of its fire inspection ordinance against the owners of a video business who refused to allow city inspectors to conduct a routine periodic inspection:
 "We are convinced, however, based upon the analysis found in Camara and See v. City of Seattle, that the existence of an administrative policy or ordinance which specifies the purpose, frequency, scope, and manner of the inspection provides a constitutional substitute for probable cause that a violation has occurred."[23]
In Board of County Comm'rs of Johnson County v. Grant,[24] the Court upheld an administrative search warrant designed to enforce a county resolution that authorized a code enforcement officer to inspect basements and storm water drainage facilities located in private residences. The Court reviewed the inspection provisions of the ordinance as well as a manual that detailed the inspection process. Applying Niewald's requirements of `frequency, scope and manner,' the Court concluded that the inspection program was sufficient to support a probable cause determination.
 "The most fundamental flaw in the property owners' argument is that `nowhere' in the documentation presented by the Board `is the frequency, scope, and manner of the inspections spelled out as required in Niewald.'
 "[From] a comparison of the property owners' contentions and the case law they rely on, it is evident that they have lost sight of the forest. Where the emphasis in case law lies in reasonableness and balancing public and private interests, the focus advocated by the property owners is narrowed to the three words used by the [Court of Appeals]-'frequency, scope and manner.' The [Court's] trilogy was intended to suggest concepts rather than to be an inflexible gauge.
 "[The] frequency, scope, and manner of the inspections required under the [program] fit the purpose and overall goal of the Program and provide a constitutional substitute for `probable cause' under the Niewald decision. The frequency of inspections . . . is directly related to the nature of the program and that of the structures to be inspected. The scope of inspection is limited to specific geographic areas where Private I I entering the public sanitary sewer system during wet conditions has been identified as a major factor contributing to the frequency and severity of sewer backups and bypasses. Together, the Code and the Private I I Procedural Manual reasonably limit the manner in which the inspections are to be conducted by Code Enforcement Officers by defining the specific areas of properties to be inspected . . . and procedures to be utilized."[25]
While Sections 6-1304 and 6-1307 of Ordinance No. 7326 address some aspects of the inspection process,[26] if the inspection program is challenged, a Court will examine the ordinance and any administrative procedures that implement the inspection provisions in order to determine whether the guidelines stated in Camara, Niewald, and Grant have been met.[27]
Finally, with regard to whether a tenant's consent is required prior to an inspection, the law is clear that a tenant has a reasonable expectation of privacy in his or her dwelling[28] and, therefore, a tenant's consent or a warrant must be obtained prior to an attempt to gain access.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Mary Feighny Assistant Attorney General
CJS:JLM:MF:jm
[1] In addition to single-family residence districts, the City also has multiple-family and duplex residential districts. The rental restriction provision applies only to single-family residence districts.
[2] 42 U.S.C. § 3601 et seq.
[3] 42 U.S.C. § 3604.
[4]. Emphasis added.
[5] 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801, (1995).
[6] 42 U.S.C. § 3607(b)(1) ("nothing in [the Federal Fair Housing Act] limits the applicability of any reasonable local . . . restrictions regarding the maximum number of occupants permitted to occupy a dwelling").
[7] The Court did not address whether the ordinance's definition of "family" violated the Act's prohibition against housing discrimination based on disability.
[8] "Group home or adult care home" is defined in City ordinance as "any dwelling occupied by not more than 10 persons, including eight or fewer persons with disabilities who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the other residents of the home. . . ."
[9] 42 U.S.C. § 3604.
[10] 42 U.S.C. § 3602(k).
[11] K.S.A. 12-16,123.
[12] Section 2(c) does allow "a municipality [to] require a landlord to provide to the municipality a list of the names of tenants . . . if a citation for a violation of an ordinance . . . adopted to protect the public health, safety or welfare has occurred on such property."
[13] Ordinance No. 7326, § 6-1306.
[14] Ordinance No. 7326, § 6-1302.
[15] Id. at § 6-1305. Violation of Ordinance No. 7326 may also entail prosecution in municipal court with a fine of between $250 and $1000 upon conviction.
[16] Ordinance No. 7326, § 6-1305.
[17] Emphasis added.
[18] Camara v. Municipal Court of the City and County of San Francisco,387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City ofSeattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed. 2d 943 (1967); Board ofCounty Commissioners of Johnson County v. Grant, 264 Kan. 58 (1998); Cityof Overland Park v. Niewald, 258 Kan. 679 (1995). See Siple v. City ofTopeka, 235 Kan. 167, 173 (1984) (ordinances requiring inspections secure for the public at large the benefits of such enactments).
[19] 387 U.S. 523.
[20] Id. at 538.
[21] Id. at 538-39.
[22] 258 Kan. 679 (1995).
[23] Id. at 682 (citations omitted).
[24] 264 Kan. 58 (1998).
[25] Id. at 64-65.
[26] Frequency of scheduled inspections, scope of inspection (i.e. the "exterior and interior of each dwelling"), entering at "reasonable times," presentation of credentials by the public officer, obtaining an administrative search warrant if entry is denied.
[27] You cite the case of Black v. Village of Forest Park,20 F. Supp.2d 1218 (N.D. Illinois, 1998), where a federal district court determined that an area inspection of rental homes did not satisfyCamara's requirement that there be "reasonable legislative or administrative standards for conducting an area inspection," because multi-family dwellings were not subjected to annual inspections and there were no appropriate limits on the scope of the inspection. In the absence of information concerning the City of Lawrence's inspection program, we do not know whether the conclusion in the Black case is on point. Moreover, a Kansas court is not bound by judicial decisions from other jurisdictions.
[28] Chapman v. United States of America, 365 U.S. 610, 81 S.Ct. 776,5 L.Ed.2d 828 (1961); Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684,109 L.Ed.2d 85 (1990); United States v. Owens, 782 F.2d 146 (10th Cir. 1986).