**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERMOUNTAIN FAIR HOUSING
COUNCIL; JANENE COWLES; and
RICHARD CHINN,
             *Plaintiffs-Appellants,*

v.

BOISE RESCUE MISSION MINISTRIES;
and BOISE RESCUE MISSION, INC.,
             *Defendants-Appellees.*

No. 10-35519

D.C. No.
1:08-cv-00205-
EJL-CWD

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
July 12, 2011—San Francisco, California

Filed September 19, 2011

Before: Sidney R. Thomas and Susan P. Graber,
Circuit Judges, and James V. Selna, District Judge.*

Opinion by Judge Graber

---

*The Honorable James V. Selna, United States District Judge for the
Central District of California, sitting by designation.

17755

## COUNSEL

Ken Nagy, Lewiston, Idaho, for the plaintiffs-appellants.

Luke W. Goodrich, The Becket Fund for Religious Liberty, Washington, D.C., for the defendants-appellees.

Linda F. Thome, U.S. Department of Justice, Washington, D.C.; Ayesha N. Khan, Washington, D.C.; Darryl P. Rains, Morrison & Foerster LLP, Palo Alto, California; Eric S. Baxter, Arent Fox LLP, Washington, D.C.; Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia; and Joseph Cascio, Kirkland & Ellis LLP, Washington, D.C., for the amici curiae.

## OPINION

GRABER, Circuit Judge:

We consider the extent of the protection afforded by the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3631, against religious discrimination. Defendant Boise Rescue Mission Ministries, a non-profit Christian organization, operates a residential drug treatment program and, at the time relevant to this appeal, two homeless shelters in Boise, Idaho. Plaintiffs Janene Cowles, Richard Chinn, and Intermountain Fair Housing Council allege that Defendant engages in religious discrimination in providing shelter and residential recovery services, in violation of the FHA. The district court granted summary judgment to Defendant, and we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Defendant is an Idaho non-profit corporation, originally incorporated as "Christ's Gospel Mission, Inc.," for the purposes of "provid[ing] for the worship of God, the teaching and preaching of the Word of God, the winning of people to a personal faith in the Lord Jesus Christ and in the spiritual improvement of mankind, . . . and to extend the ministry of the Gospel unto all the earth." To those ends, Defendant operates two services that are relevant here. First, Defendant has a residential drug treatment program that provides an "intensive, Christ-based residential recovery program for people with chemical dependency or alcoholism." Second, Defendant runs homeless shelters to "return the poor, needy and homeless to society as self-sufficient, productive citizens." Plaintiff Cowles participated in the drug treatment program. Plaintiff Chinn stayed from time to time in Defendant's homeless shelters.

A. *The Residential Drug Treatment Program and Plaintiff Cowles*

Defendant requires all participants in its residential drug treatment program to be, or to desire to be, Christian. They must engage in a "wide range" of Christian activities, including worship services, Bible study, public and private prayer, religious singing, and public Bible reading. Defendant does not charge a fee for attending its drug treatment program.

A "Program Policies and Description" form and a "Program House Rules and Procedures" pamphlet apprise potential participants of what will be expected. The program entails a full year of treatment to help women[1] "to develop a relationship with God, themselves, and others through classes, coun-

---

[1]Defendant operates a separate drug treatment program for men. Because Plaintiffs do not challenge the legality of the men's program, we do not address it.

seling, and group interaction." The program description expressly states that participants must engage in Bible study and attend church services each week.

The program places heavy restrictions on participants' other activities. For example, they may not make phone calls or receive mail during the first month. Thereafter, they may receive visitors only on Sundays between 2 and 4 p.m. They may leave Defendant's facility only if the staff grants them a pass, which is earned through good behavior. Participants may not work for an outside employer during at least the first nine months of their treatment.

Cowles wrote a letter to Defendant in November 2005. She stated that she had been charged with possession of methamphetamine. The judge presiding over her criminal proceeding sentenced her to a year in the county jail, but she recommended that Cowles enroll in Defendant's drug treatment program. If Cowles enrolled in the program, the judge stated that she would order Cowles' release on probation pending her successful completion of the program. Otherwise, Cowles had to serve out her sentence.

In her letter to Defendant, Cowles gave the impression that she understood the religious nature of Defendant's program and that she desired to participate in the program because of its religious nature. She wrote: "I am searching for guidance and knowledge and peace. When I have had God in my life things weren't perfect but I had an inner peace I miss very much. . . . I am focused on changing my life through God and spiritual growth." Cowles asked Defendant to put her on the program's waiting list and to contact her as soon as possible.

Defendant's staff interviewed Cowles on March 2, 2006. They told Cowles about the program's rules and "intense, faith-based curriculum." They also provided Cowles with a copy of the program description. Defendant formally accepted Cowles into its drug treatment program on March 7.

True to the description of its program, Defendant required Cowles to participate in religious activities.[2] She could not read secular books or listen to secular music. She had to attend church every Sunday and, if she refused to attend Defendant's services, she could go to one of only four other nearby churches that Defendant had approved. She also had to attend daily services, where she had to sing hymns in the choir, pray silently and out loud, recite Bible verses, and allow the "laying on of hands." On a regular basis, she was required to "cast out demons" in the facility, using oil and holy water. On May 4, 2006, Plaintiff had to participate in the National Day of Prayer at the Idaho Capitol Building.

On three occasions Cowles became so upset by these practices that she ran out of the room crying. At those times, Defendant's Women's Ministry Director told Cowles that she would go to Hell and would be left behind if she did not "accept Jesus Christ as her personal savior." When Cowles asked if she could graduate from the program without converting to Christianity, Defendant's staff told her that graduation without conversion had "never happened."

At times Cowles heard Defendant's staff ridicule Mormons. The pastor who led many of Defendant's religious services called Mormons "crazy." When a Mormon woman entered the program, a staff member vowed to "straighten her out." Within a month, the woman was baptized into Defendant's faith.

In late May or early June 2006, about three months after her acceptance into the program, Cowles asked to transfer to

---

[2]Because this case comes to us through Defendant's motion for summary judgment, we must consider the evidence in the light most favorable to Plaintiffs and must draw all reasonable inferences in their favor. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Defendant denies having engaged in any kind of discrimination or retaliation, religious or otherwise, and denies many of the specific facts asserted by Plaintiffs and described in text.

a different, non-religious treatment facility. Purportedly in retaliation for making that request, the Women's Ministry Director restricted Cowles' activities and required that she place all of her telephone calls to her lawyer on speaker phone so that Defendant's staff could listen to them. Other participants told Cowles that Defendant's staff had encouraged them to make false allegations against Cowles and to exclude Cowles because she was not Christian.

In addition to the alleged abuse that she received for not accepting Christianity, Cowles also alleges that she experienced sex discrimination. She could not work outside Defendant's facility or visit with her 7-year-old son except during the two hours on Sundays set aside for visitation. Plaintiff alleges that similarly situated men in the drug treatment program could work for outside employers and could have more frequent family visits.

On June 7, 2006, the Women's Ministry Director wrote to Cowles' lawyer. She asked that Cowles be removed from Defendant's program immediately and placed elsewhere because Cowles was "not in agreement with the biblically based curriculum and classes that are required" in the program. Cowles remained in the program, however, for two more months.

On August 20, 2006, the director called Cowles to her office and asked Cowles whether she was Christian. Cowles confirmed that she was not. On August 30, 2006, the director contacted Cowles' probation officer to report that Cowles could not complete the program. Cowles went back to jail.

Cowles eventually filed a complaint with the Federal Department of Housing and Urban Development ("HUD"), alleging that Defendant had discriminated against her because of her sex and religion while she attended Defendant's drug treatment program. Cowles further alleged that Defendant had engaged in unlawful retaliation after Cowles complained to

Defendant's staff about the program's religious components. HUD investigated and found that, "[a]lthough [Cowles] was directed to [Defendant's] program by the court, she was aware that it was faith based." Moreover, HUD determined that the FHA's religious exemption permitted Defendant to reserve its program for Christians, so Cowles could not base a viable FHA claim on those activities.

HUD rejected Cowles' sex discrimination claim because it lacked evidentiary support. Cowles "acknowledged that she has never talked to any man who participated in [Defendant's] program" and "was not able to personally observe any differences" between the program for men and the program for women.

Finally, HUD rejected Cowles' retaliation claim because a letter that Cowles wrote to the state court contradicted her claim. According to HUD, the letter said:

> I need the judge to know the program was great. I was the one displaced. That there were no hard feelings; I need her to know what my behavior was like and my effort to blend and effort to do the work even when it didn't really apply to me. I can't even keep it short when I think about [Defendant] and how much everything and everyone meant to me. . . . I will never have an experience comparable and there is so much I miss. I miss my friends.

Because of that letter, HUD disbelieved Cowles' allegations of retaliation. For those reasons, HUD dismissed Cowles' complaint in its entirety.

B.   *The Homeless Shelters and Plaintiff Chinn*

At the time relevant to this appeal, Defendant operated two homeless shelters in Boise: the Front Street Men's Mission (the "Front Street Shelter") and the River of Life Rescue Mis-

sion (the "River of Life Shelter"). Only people with no other safe place to go may stay at Defendant's shelters. Guests who stay there must complete and sign an intake form, which asks them questions about their background.

Although Defendant accepts people of all faiths, the intake form tells guests:

> This is a Gospel Rescue Mission. Gospel means 'Good News,' and the Good News is that Jesus saves us from sin past, present, and future. We would like to share the Good News with you. Have you heard of Jesus?

Guests also must read and acknowledge the emergency shelter's rules, which include the following guidelines:

> [Defendant] offers a variety of religious services, such as chapel services, pre-meal prayers and morning devotions. [Defendant] encourages [guests] to attend those services for [their] own spiritual growth and development, but [guests] are not required to attend any religious services as a condition of receiving services from [Defendant].

New guests receive some personal items and a bed assignment, which may require that they sleep on the floor if the number of guests exceeds the number of beds. No one gets a private room. Guests who intend to return for the next night must make their beds and store their pajamas under their pillows. They may not leave any other personal items in the shelter after they leave for the day. Defendant does not charge its guests any fee for using its shelters.

Guests may stay for a maximum of seventeen consecutive nights during the warm months. Defendant imposes no limit on the number of nights that guests may stay during the cold months. Defendant bars services for thirty days for guests

who do not come back to the shelter during their intended stay "to help prevent the shelter from becoming an 'occasional shelter' that helps enable a homeless lifestyle for the chronically homeless."

Defendant provides "spiritual guidance, Christian counseling, and Christian religious services" to those who stay at its shelters. It conducts "numerous religious activities" every day, including "worship services, [B]ible studies and prayer."

Chinn stayed at the Front Street Shelter in May 2005 and again in October, November, and December 2005. He also stayed at the River of Life Shelter in October 2005. When he first arrived at the Front Street Shelter, Defendant's staff told Chinn that he would have to participate in Christian religious activities if he wanted to stay and eat there. He later observed that Defendant's staff forced guests who did not attend religious services to wait outside or in the dining room until those services had ended. He also observed that Defendant's staff made guests who had not attended services wait to eat until those who had attended services obtained their food. As a consequence, guests who did not attend services "received substitute food of inferior quality when the prepared food ran out." Chinn noticed the same practices at the River of Life Shelter.

According to Chinn, fifteen to twenty of Defendant's fifty to seventy guests did not attend services "because they resented the requirement." The services offended Chinn in particular because he is Mormon. Chinn frequently heard Defendant's staff make derogatory comments about the Mormon faith, sometimes calling it a "cult." Because of Defendant's discriminatory practices and attitudes, Chinn stopped staying at its shelters.

Chinn also filed a complaint with HUD, similarly alleging religious discrimination in violation of the FHA. HUD investigated Chinn's complaint but found "no reasonable cause . . .

to believe that a discriminatory housing practice [had] occurred." HUD disbelieved Chinn's allegations, finding that "there did not appear to be any repercussions for not attending [religious services] and in one facility nearly [one-third] of the guests did not attend." HUD dismissed Chinn's complaint.

## C.   *Procedural History*

After HUD refused to act on Cowles' and Chinn's complaints, they brought this action in federal district court. The district court granted summary judgment to Defendant. Plaintiffs timely appeal.

## DISCUSSION[3]

## A.   *The Religious Discrimination Claims*

### 1.   *The FHA's Anti-Discrimination Provisions*

We begin by outlining the relevant statutory framework. Congress has articulated a policy of providing, within constitutional limits, for fair housing throughout the United States. 42 U.S.C. § 3601. Consistent with that broad policy, Congress included in the FHA two anti-discrimination provisions that are relevant here. Under the first, *id.* § 3604(a), it is unlawful

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

---

[3]We review de novo an entry of summary judgment. *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir. 1994) (per curiam). We may affirm an entry of summary judgment on any ground supported by the record. *Olsen*, 363 F.3d at 922. Accordingly, although we affirm the judgment, we do so for reasons different than the ones on which the district court relied.

Under the second, *id.* § 3604(b), it is similarly unlawful

> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

The FHA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." *Id.* § 3602(b). The FHA does not define "residence."

Defendant acknowledges that the anti-discrimination provisions in the FHA apply to the residential drug treatment program attended by Cowles. But Defendant asserts that those provisions do not apply to its homeless shelters, for two independent reasons. First, relying on the references to the "sale or rental of . . . a dwelling" in § 3604(a) and (b), Defendant argues that Congress intended for those provisions to apply only in the context of selling and renting dwellings. Because Defendant operates its shelters at no charge to its guests, Defendant urges us to hold that its homeless shelters do not fall within the ambit of § 3604(a) and (b).

Second, Defendant argues that its homeless shelters do not fit Congress' definition of "dwelling" because its shelters are neither occupied as, nor designed or intended to be occupied as, residences. Relying on authority from the Third and Eleventh Circuits, Defendant understands the term "residence" in § 3602(b) to mean "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit." *Lakeside Resort Enters., LP v. Bd. of Supervisors*, 455 F.3d 154, 157 (3d Cir. 2006) (internal quotation marks omitted); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1214 (11th Cir. 2008) (adopting the same definition). Drawing on that definition, both of those circuits held that, at

a minimum, a "residence" is a place designed for occupants to treat as their home for a significant period of time. *Lakeside Resort*, 455 F.3d at 158; *Schwarz*, 544 F.3d at 1215.

Defendant urges us to define "residence" as the Third and Eleventh Circuits did. That definition, according to Defendant, leads to the conclusion that its homeless shelters are not residences, because Defendant does not permit its guests either to stay there for a significant period of time or to treat the shelters as their homes. Plaintiffs and HUD dispute Defendant's factual and legal conclusions, arguing that § 3604(a) and (b) do apply to Defendant's homeless shelters.[4] In the circumstances, we need not and do not decide either of the questions of statutory interpretation raised by Defendant. Even assuming that § 3604(a) and (b) apply to Defendant's homeless shelters, the FHA's religious exemption permits the practices challenged by Plaintiffs in this case. We therefore express no view on the merits of Defendant's arguments about the proper scope of § 3604(a) and (b) and the proper definition of "residence" in § 3602(b).

## 2. *The Religious Exemption*

**[1]** Although § 3604(a) and (b) of the FHA prohibit religious discrimination generally, in 42 U.S.C. § 3607(a) Congress provided an exemption for religious organizations that want to limit access to their charitable services to people who practice the same religion. Specifically, § 3607(a) provides in relevant part:

> (a) Nothing in [the FHA] shall prohibit a religious

---

[4]Appearing as amicus curiae at our invitation, the Secretary of HUD takes the position that § 3604(a) and (b) do apply to some situations in which a dwelling is neither sold nor rented. The Secretary also thinks that if Defendant's guests stay long enough and treat Defendant's shelters enough like a home, then the shelters qualify as residences even under the reasoning of our sister circuits.

organization . . . from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin.

We recognize that we must construe § 3607(a) narrowly. *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995) (construing the FHA's "absolute exemption," contained in 42 U.S.C. § 3607(b)(1), narrowly to effectuate the FHA's broad policy of providing fair housing throughout the United States). We nevertheless conclude that § 3607(a) exempts the practices challenged here.[5]

No one disputes that Defendant is a bona fide Christian organization that does not restrict its membership on account of race, color, or national origin. And no one disputes that Defendant operates its homeless shelters and drug treatment program for "other than a commercial purpose." Because Defendant satisfies those threshold requirements, this case presents us with the opportunity to apply § 3607(a) cleanly to the religious practices at issue.

**[2]** With respect to the drug treatment program, we see nothing in Cowles' allegations to suggest that Defendant does anything other than give preference to persons of its religion. To the contrary, those allegations are consistent with Defen-

---

[5]As an initial matter, Plaintiffs argue that Defendant lost the opportunity to challenge the district court's decision that § 3607(a) does not exempt its activities when Defendant failed to cross-appeal from that decision. We disagree. So long as a prevailing party wants us to uphold the judgment entered below, it need not cross-appeal. *See S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1133 n.8 (9th Cir. 2004) ("A prevailing party need not cross-appeal to defend a judgment on any ground properly raised below, as long as it seeks to preserve rather than to change the judgment.").

dant's avowal that it restricts membership in its religiously based drug treatment program to Christians and people who desire to become Christian. According to Cowles, Defendant required her "to participate in religious activities as a condition of continued residence." Those activities included "church services every Sunday," "religiously-based substance abuse treatment," and other "religious services . . . throughout the day." Eventually, after Cowles made it clear to Defendant's staff that she was not, and did not want to become, Christian, Defendant terminated Cowles' participation in the program. Because § 3607(a) permits a religious organization to "limit[ ] the . . . occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion," we hold that the practices alleged to have taken place in Defendant's drug treatment program do not violate the FHA. Cowles' religious discrimination claim therefore fails as a matter of law.[6]

[3] So too does Chinn's religious discrimination claim. According to Chinn, Defendant encourages guests of its homeless shelters to attend religious services. If they do, they go to the front of the line for food and housing. If they do not, they must wait outside the shelters or in the dining rooms until services conclude. Those who refuse to attend services also must wait at the end of the food line and sometimes get

---

[6]We pause to observe that two organizations, appearing here as amici curiae, make an Establishment Clause challenge to Defendant's drug treatment program. Americans United for Separation of Church and State and the Anti-Defamation League argue that, because the state trial court allegedly gave Cowles a choice between attending Defendant's religious program and staying in jail for a year, and because Defendant, knowing of that ultimatum, accepted Cowles into its program, Defendant became akin to a government actor. As a government actor, amici argue, Defendant cannot constitutionally prefer people of one religion over people of any other. Plaintiffs nowhere have raised, adopted, or endorsed that argument. We therefore deem it waived and express no view on its merits. *See, e.g., United States v. Gementera*, 379 F.3d 596, 607 (9th Cir. 2004) ("Generally, we do not consider on appeal an issue raised only by an amicus." (internal quotation marks omitted)).

"inferior" food. Those practices amount to "giving preference" to people of Defendant's religion. Accordingly, § 3607(a) exempts them from violating the FHA.

[4] Plaintiffs urge us to reach the opposite conclusion.[7] With respect to Defendant's homeless shelters, they reason that, because homeless people who attend Defendant's religious services are not *necessarily* Christians, the exemption does not allow Defendant to give preference to Christians. We find that construction of § 3607(a) too restrictive. Defendant reasonably assumes that those who come to its shelters, who read and complete the admission form that apprises them of Defendant's religious purposes, and who thereafter attend its religious services are Christian. The exemption does not require Defendant to make intensive inquiries of those whom it serves or to prove that every person to whom it gives a preference believes sincerely in Christianity.

With respect to the drug treatment program, Plaintiffs reason that, because Defendant admitted Cowles to its drug treatment program even though Cowles was not a Christian, Defendant cannot credibly claim that it restricts membership in its program to Christians. They further argue that, because § 3607(a) does not in their view allow Defendant to require its participants to become Christian before graduating, Defendant's drug treatment program violates the FHA. We disagree.

[5] First, the record shows that Defendant had every reason to think that Cowles was Christian when it admitted her. Cowles knew when she applied that Defendant required all participants to engage in a "wide range" of Christian activities. In her letter requesting admission, she expressed a deep desire to find God. To be sure that Cowles understood the nature of its program, Defendant's staff interviewed her. Staff

---

[7]The Secretary of HUD agrees that § 3607(a) exempts Defendant's religious practices from violating the anti-discrimination provisions of the FHA.

members emphasized the Christian religious requirements of the program, and Cowles gave no indication that she had any concerns about those requirements.

**[6]** Even if there were a genuine issue of fact with respect to Cowles' religion at the time of her acceptance into Defendant's program, however, Cowles' religious discrimination claim still fails. Requiring participants to convert to Christianity before permitting them to graduate from the program constitutes "giving preference" to Christian participants. Accordingly, even under Cowles' version of the facts, Defendant's drug treatment program does not violate the FHA because the preference for Christians, and those who desire to become so, falls within the scope of § 3607(a).

B. *Cowles' Sex Discrimination Claim*

**[7]** We affirm the summary judgment on Cowles' sex discrimination claim because Cowles put forward no competent evidence to establish that Defendant treats the men in its parallel drug treatment program any differently than it treats the women in the program that she attended. The only evidence submitted was Cowles' own affidavit, in which she stated:

> While residing at the [drug treatment facility for women], I was not permitted to work and was permitted to have only very brief visits with my then seven-year-old son for a two hour period on one day per week. Similarly-situated male residents at the male-only facility operated by [Defendant] were permitted to work and have more frequent visitors of the opposite sex.

Cowles provides no explanation for how she became aware of the alleged differences between Defendant's programs, and she therefore has failed to demonstrate that she has personal knowledge of those differences. Her conclusory affidavit is insufficient to defeat summary judgment on her sex discrimi-

nation claim. *See Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993) ("Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient [to defeat summary judgment].").

## C.    *The "Interference, Coercion, or Intimidation" Claim*

**[8]** Plaintiffs' final claims for relief rely on 42 U.S.C. § 3617, which makes it unlawful

> to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [§ 3604].

Those claims depend on the validity of Plaintiffs' religious discrimination claims. Defendant's alleged retaliation against Chinn and Cowles runs afoul of § 3617 only if Chinn and Cowles were "exercis[ing] or enjoy[ing] . . . [a] right granted or protected by [§ 3604]." Because Chinn had no right to be treated the same as Defendant's Christian guests, and because Cowles had no right to participate in Defendant's drug treatment program unless she agreed to become Christian, we conclude that neither Chinn nor Cowles was exercising a right granted to them by § 3604. Accordingly, we affirm the district court's summary judgment for Defendant on the retaliation claims.

AFFIRMED.